[No. B164398. Second Dist., Div. Three. Jan. 30, 2008.]

JODIE BULLOCK, Plaintiff and Appellant, v.
PHILLIP MORRIS USA, INC., Defendant and Appellant.

[No. B169083. Second Dist., Div. Three. Jan. 30, 2008.]

JODIE BULLOCK, Plaintiff, v.
PHILIP MORRIS USA, INC., Defendant and Respondent;
MICHAEL J. PIUZE, Objector and Appellant.

656

658

## COUNSEL

Law Offices of Michael J. Piuze, Michael J. Piuze and Geraldine Weiss for Plaintiff and Appellant.

Law Offices of Jeffrey K. Winikow, Jeffrey K. Winikow; Law Office of Barry Wolf, Barry Wolf; Pine and Pine and Norman Pine for California Employment Lawyers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Center for Constitutional Litigation, Robert S. Peck, Louis M. Bograd and Valerie Nannery for Robert S. Peck as Amicus Curiae on behalf of Plaintiff and Appellant.

Law Offices of Holly L. Hostrop and Holly L. Hostrop for Tobacco Trial Lawyers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Arnold & Porter, Ronald C. Redcay and Murray R. Garnick for Defendant and Appellant and for Defendant and Respondent.

Dunn Koes, Pamela E. Dunn and Daniel J. Koes for Association of Southern California Defense Counsel as Amicus Curiae on behalf of Defendant and Appellant and Defendant and Respondent.

O'Melveny & Myers, Charles C. Lifland and Marc S. Williams for California Manufacturers & Technology Association as Amicus Curiae on behalf of Defendant and Appellant and Defendant and Respondent.

Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., William E. Thomson and Dominic Lanza for Chamber of Commerce of the United States of America as Amicus Curiae on behalf of Defendant and Appellant and Defendant and Respondent.

Haight, Brown & Bonesteel, Rita Gunasekaran, Maureen Haight Gee; Law Offices of Michael J. Piuze, Michael J. Piuze and Geraldine Weiss for Objector and Appellant.

Fred J. Hiestand for Civil Justice Association of California as Amicus Curiae.

Pillsbury & Levinson, Arnold R. Levinson; Altshuler Berzon, James Finberg; Lieff, Cabraser, Heimann & Bernstein and Robert J. Nelson for Consumer Attorneys of California, Arnold R. Levinson and Robert J. Nelson as Amici Curiae.

Deborah J. La Fetra and Timothy Sandefur for Pacific Legal Foundation as Amicus Curiae.

OPINION

**CROSKEY, J.**—Philip Morris USA, Inc. (Philip Morris), a cigarette manufacturer, appeals a judgment in favor of Betty Bullock awarding her compensatory and punitive damages after a jury trial. Philip Morris challenges the findings of liability on several counts based on products liability and fraud, the admission of evidence, the refusal of proposed jury instructions relating to liability and punitive damages, and the amount of the punitive damages award. Jodie Bullock, Betty Bullock's successor in interest, also appeals, challenging a conditional new trial order that reduced the amount of punitive damages by way of remittitur.[1] Bullock's attorney, Michael J. Piuze, appeals an order awarding attorney fees against him as a sanction.

We conclude that Philip Morris has shown no error with respect to its liability for fraud and products liability, but that the refusal of Philip Morris's proposed instruction not to impose punishment for harm caused to nonparties to the litigation was error. We therefore affirm the judgment as to the finding of liability, the award of compensatory damages, and the finding that Philip Morris was guilty of oppression, fraud, or malice, and reverse the judgment as to the amount of punitive damages, with directions to conduct a new trial limited to determining that issue. We also hold that the court had no authority to award attorney fees as a sanction against Piuze and reverse the sanctions order.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Factual Background[2]

Bullock smoked cigarettes manufactured by Philip Morris for 45 years from 1956, when she was 17 years old, until she was diagnosed with lung cancer in 2001. She smoked Philip Morris's Marlboro brand of cigarettes until 1966, and then switched to its Benson & Hedges brand.

Scientific and medical professionals in the United States and worldwide generally agreed by the late 1950's that cigarette smoking caused lung cancer, after several epidemiological studies reached that conclusion. Philip Morris and other cigarette manufacturers sought to cast doubt on the increasing body

---

[1] We ordered the substitution of Jodie Bullock in the place of Betty Bullock in this appeal after the death of Betty Bullock (Code Civ. Proc., § 377.31; Cal. Rules of Court, rule 8.36(a)). We use the name Bullock to refer to either Jodie Bullock or Betty Bullock, as appropriate in context.

[2] Our recitation of the facts is based on the evidence presented at trial viewed in a light most favorable to Bullock, the successful plaintiff. (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 642, fn. 3 [11 Cal.Rptr.3d 807].)

of knowledge supporting the conclusion that smoking caused lung cancer and sought to assuage smokers' concerns. To that end, Philip Morris and other cigarette manufacturers issued a full-page announcement in newspapers throughout the United States in January 1954 entitled "A Frank Statement to Cigarette Smokers." The announcement stated, "Recent reports on experiments with mice have given wide publicity to a theory that cigarette smoking is in some way linked with lung cancer in human beings," and stated, "[d]istinguished authorities point[ed] out" that there was no proof that cigarette smoking caused cancer and that "numerous scientists" questioned "the validity of the statistics themselves."

That announcement also stated, "We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business. [¶] We believe the products we make are not injurious to health. [¶] We always have and always will cooperate closely with those whose task it is to safeguard the public health." It announced the formation of the Tobacco Industry Research Committee and stated, "We are pledging aid and assistance to the research effort into all phases of tobacco use and health. This joint financial aid will of course be in addition to what is already being contributed by individual companies. [¶] . . . [¶] In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute. In addition there will be an Advisory Board of scientists disinterested in the cigarette industry. A group of distinguished men from medicine, science, and education will be invited to serve on this Board. These scientists will advise the Committee on its research activities." In the years that followed, the tobacco industry research committee and its publicists disseminated the message that there was no proof that cigarette smoking was a cause of lung cancer and other diseases through news releases, distribution of research and editorial materials favorable to the tobacco industry, personal contacts with editors, journalists, and producers, and other means.

Philip Morris for many years publicly continued to insist that there was no consensus in the scientific community that cigarette smoking was a cause of lung cancer and that Philip Morris was actively pursuing scientific research to resolve the purported controversy, while privately acknowledging that there was no true controversy, that its true goal was to discredit reports that linked smoking with lung cancer, and that Philip Morris had no intention of funding research that would reveal the health hazards of smoking. The Tobacco Institute, a trade organization funded by Philip Morris and other cigarette manufacturers, issued a press release in 1961 discrediting a recent article and stating that the views that smoking caused cancer "are a subject of much disagreement in the scientific world" and "the cause or causes of lung cancer continue to be unknown." The Tobacco Institute stated in a press release in 1963 that the tobacco industry was "vitally interested in getting the facts that will provide answers to questions about smoking and health," and described

the industry's research efforts as a "crusade for research—in the agricultural stations, the scientific laboratories, and the great hospitals and medical centers of the nation." It stated, "the industry does not know the causes of the diseases in question."

A cigarette company executive appearing before Congress in 1965 on behalf of several cigarette manufacturers, including Philip Morris, stated that "[n]early everyone familiar with these difficult problems will agree . . . that there is a very high degree of uncertainty" whether "smoking causes cancer or any other disease." Later that year, the Tobacco Institute issued a press release stating, "Research to date has not established whether smoking is or is not causally involved in such diseases as lung cancer and heart disease, despite efforts to make it seem otherwise. The matter remains an open question—for resolution by scientists." The press release stated, "we are earnestly trying to find the answers," and "If there is something in tobacco that is causally related to cancer or any other disease, the tobacco industry wants to find out what it is, and the sooner the better. If it is something in tobacco or the smoke, I am sure this can be remedied by the scientists."

Philip Morris's chief executive officer and chairman of the Executive Committee of the Tobacco Institute, Joseph Cullman III, stated on the television news program *Face the Nation* (CBS, Jan. 3, 1971), "if any ingredient in cigarette smoke is identified as being injurious to human health, we are confident that we can eliminate that ingredient." He stated further, "We do not believe that cigarettes are hazardous; we don't accept that." The Tobacco Institute issued a report in 1979 entitled Smoking and Health 1969-1979: The Continuing Controversy, stating, "Scientists have not proven that cigarette smoke or any of the thousands of its constituents as found in cigarette smoke cause human disease." The Tobacco Institute issued a report in 1984 entitled The Cigarette Controversy: Why More Research Is Needed, stating, "*it is not known whether smoking has a role in the development of various diseases . . . a great deal more research is needed to uncover the causes and the mechanisms involved in their onset.*" The 1984 report stated that the theory that cigarette smoking causes various diseases "is just that, a theory" and stated, "There were basic flaws in the methods used in the major epidemiological surveys that cast doubts on the accuracy of the claimed correlations."

Contrary to its repeated public pronouncements, the evidence shows that Philip Morris privately acknowledged the link between cigarette smoking and lung cancer and other diseases and sought to avoid promoting any research that would reveal that link. An internal document prepared by Philip Morris in 1961 for purposes of research and development stated, "Carcinogens are found in practically every class of compounds in smoke," and provided a "partial list" of 40 "carcinogens" in cigarette smoke.

A 1970 memorandum from a Philip Morris research scientist to its president stated of the Council for Tobacco Research, the successor of the Tobacco Industry Research Committee: "It has been stated that CTR is a program to find out 'the truth about smoking and health.' What is truth to one is false to another. CTR and the Industry have publicly and frequently denied what others find as 'truth.' Let's face it. We are interested in evidence which we believe denies the allegation that cigarette smoking causes disease." Notes from a 1978 meeting of cigarette company executives and legal counsel stated that the Tobacco Industry Research Committee "was set up as an industry 'shield' " and that the Council for Tobacco Research "has acted as a 'front.' "

Dr. William Farone, a chemist employed by Philip Morris as a scientific researcher beginning in 1976 and as director of applied research from 1977 to 1984, testified at trial that his superiors informed him that cigarette smoking caused cancer and was addictive when he first began to work for the company. Dr. Farone testified that during his years at Philip Morris there was no controversy among its scientists as to whether smoking caused diseases, and that public statements that it was not known whether smoking played a role in the development of various diseases, and that a great deal more research was needed to identify the causes of the diseases, were false. He testified that another public statement challenging the epidemiological research as inconclusive was a misleading half-truth, and that Philip Morris's scientists knew that cigarette smoke contained carcinogens and that the carcinogens caused cancer.

Dr. Farone testified that Dr. Thomas Osdene, Philip Morris's director of research, and others told him on several occasions that Dr. Osdene's real job, and the job of scientists working under him, was to maintain the appearance of a scientific controversy concerning smoking and health. Moreover, Dr. Farone testified that Philip Morris performed no animal toxicity studies of cigarettes in the United States, pursuant to a "gentleman's agreement" with other cigarette manufacturers, but arranged for a company in Germany to perform toxicity tests on animals there. Other Philip Morris scientists explained to Dr. Farone that the reason for testing cigarettes abroad was so the results would not be available by subpoena in the United States. The test results were sent to Dr. Osdene, usually at his home, who would report the results to other Philip Morris scientists orally and destroy the written records.

Philip Morris conducted animal research in the United States on the addictive effects of nicotine in the early 1980's. It sought to develop a substitute for nicotine that would produce the same addictive effects but without the adverse cardiovascular effects of nicotine. Philip Morris closely

guarded the results of its research and threatened to sue its former scientists who proposed publication of an article. Philip Morris successfully developed nicotine analogs and had the ability to remove nicotine from cigarettes, but did not do so. Moreover, Philip Morris added urea to cigarettes, which becomes ammonia when heated, to enhance the effect of nicotine. Philip Morris added approximately 250 different substances to tobacco in cigarettes to enhance the flavor and for other purposes. A former Philip Morris research scientist who worked for the company in the early 1980's testified, "Never once in my whole time at the company did I hear any concern for the customer, other than one scientist[] who was complaining that he was repeatedly—repeatedly having his research changed in direction any time he came upon some hot research."

Philip Morris heavily advertised its cigarettes on television in the 1950's and 1960's, until the federal government banned cigarette advertising on television in 1970. Television advertising had a particularly strong influence on youths under the age of 18, for whom there was a positive correlation between television viewing time and the incidence of smoking. Philip Morris's print advertisements for Marlboro and other cigarette brands in 1956, when Bullock began smoking at the age of 17, and generally in the years from 1954 to 1969, depicted handsome men and glamorous young women. Some advertisements featured slogans such as "Loved for Gentleness" and " 'The gentlest cigarette you can smoke.' "

Philip Morris and other cigarette manufacturers entered into a master settlement agreement (MSA) with 46 states, including California, in 1998 settling civil litigation by the states against the manufacturers. The manufacturers denied the allegations of wrongdoing and admitted no liability, but agreed to several restrictions on the advertising and promotion of cigarettes. They also agreed to dissolve the Tobacco Institute, the Council for Tobacco Research, and the Council for Indoor Air Research, and agreed not to target youths as smokers or potential smokers, suppress research on the health hazards of smoking, or make any misrepresentation of fact concerning the health consequences of smoking. The participating cigarette manufacturers also agreed to pay several billion dollars per year to the states, with each manufacturer responsible for a portion of the total payment according to its market share.

Philip Morris issued a statement on its Internet site in December 1999 acknowledging for the first time: "There is an overwhelming medical and scientific consensus that cigarette smoking causes lung cancer, heart disease, emphysema and other serious diseases in smokers. Smokers are far more likely to develop serious diseases, like lung cancer, than non-smokers. There

is no 'safe' cigarette. These are and have been the messages of public health authorities worldwide." The statement also acknowledged that cigarette smoking is addictive.

### 2. Trial Court Proceedings

Bullock sued Philip Morris in April 2001 seeking to recover damages for personal injuries based on products liability and fraud, among other counts. The jury trial commenced on August 20, 2002. The jury returned a special verdict in September 2002 finding that there was a defect in the design of the cigarettes and that they were negligently designed; that Philip Morris failed to adequately warn Bullock of the dangers of smoking before July 1, 1969; that it intentionally and negligently misrepresented material facts and made a false promise; that it intentionally concealed material facts before July 1, 1969; and that each of those acts of misconduct was a cause of Bullock's injury. The jury found that Philip Morris was guilty of oppression, fraud, or malice with respect to each count. The jury awarded Bullock $850,000 in compensatory damages, including $100,000 in noneconomic damages for pain and suffering, and later awarded her $28 billion in punitive damages. The court entered a judgment on the jury verdicts.

The court denied Philip Morris's motion for judgment notwithstanding the verdict and denied in part its motion for a new trial, but granted the new trial motion as to excessive damages, with the condition that the court would deny the new trial motion if Bullock consented to reduce the punitive damages award to $28 million. Bullock consented to the reduction. The court entered an amended judgment in January 2003 awarding a total of $28,850,000 in compensatory and punitive damages. Philip Morris appealed the amended judgment and the order denying its motion for judgment notwithstanding the verdict. Bullock filed a notice of appeal from "the Order . . . granting a new trial on the issue of punitive damages."[3] Bullock died in February 2003.

Piuze filed judgment liens in California, Virginia, and New York. The parties later stipulated that Philip Morris could deposit United States treasury bills in lieu of a bond to stay enforcement of the judgment pending appeal, and that the stay would become effective upon receipt of the deposit by the court clerk. After learning of the judgment liens, Philip Morris applied ex parte for an order staying enforcement of the judgment. The court granted the ex parte application on April 17, 2003, and entered an order temporarily

---

[3] We construe Bullock's notice of appeal as an appeal from the previously entered amended judgment encompassing the remittitur. It is reasonably clear that Bullock intended to challenge the amended judgment, and Philip Morris was not misled or prejudiced in this regard. (Cal. Rules of Court, rule 8.100(a)(2); *Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 22 [23 Cal.Rptr.3d 490, 104 P.3d 844].)

staying enforcement of the judgment and directing Bullock to withdraw the liens. The court signed an order approving the stipulation on the deposit the same day.

Philip Morris filed a motion on April 29, 2003, for an award of sanctions against Piuze and Bullock under Code of Civil Procedure sections 128.6 and 177.5, arguing that they failed to withdraw the judgment liens as ordered by the court and engaged in other bad faith, frivolous conduct. The court granted the motion against Piuze in June 2003, awarding Philip Morris $45,809.48 in attorney fees payable by Piuze, under Code of Civil Procedure section 128.6. Piuze appealed the sanctions order.

## CONTENTIONS

Philip Morris contends (1) the evidence failed to establish a design defect under the risk-benefit test because there is no substantial evidence that a safer alternative cigarette design was available, that the failure to use a safer design was a cause of Bullock's lung cancer, or that Bullock would have smoked a safer cigarette if it were available; (2) the evidence failed to establish a design defect under the consumer expectations test or liability based on a failure to warn because there is no substantial evidence that the ordinary consumer was unaware of the dangers of cigarette smoking; (3) the evidence failed to establish that Bullock heard and actually relied on a false statement by Philip Morris; (4) the failure to instruct the jury that Philip Morris had a duty to disclose only if the information was not readily accessible to Bullock was error; (5) information that smoking causes lung cancer was readily accessible to Bullock, so Philip Morris had no duty to disclose that fact and cannot be liable for fraudulent concealment; (6) federal law preempts certain state law liability based on the advertising or promotion of cigarettes after July 1, 1969, and the court erred by admitting evidence of advertising and by failing to instruct the jury that certain liability cannot be based on that evidence; (7) the $28 billion punitive damages award was excessive under California law, the jury acted out of passion and prejudice, and the only appropriate remedy is a new trial; (8) Bullock's counsel improperly appealed to the jurors' passion and prejudice, emphasized Philip Morris's wealth, and urged the jury to disregard the requirement that the amount of punitive damages must be reasonably related to the amount of compensatory damages; (9) the refusal of Philip Morris's proposed instructions on punitive damages was error; (10) the court improperly instructed the jury to award punitive damages in an amount that would have a deterrent effect in light of Philip Morris's financial condition; (11) the evidence of Philip Morris's financial condition was unreliable and did not accurately reflect its ability to pay; (12) the $28 million punitive damages award after remittitur is unconstitutionally excessive; and (13) if we find error in the punitive damages award, a new trial should encompass liability as well as punitive damages.

Bullock contends the punitive damages award by the jury followed a fair trial, was presumptively correct, and should not have been reduced by remittitur because there was no compelling basis to do so. Piuze contends there was no statutory basis for the attorney fee award against him and also challenges the award on other grounds.

## DISCUSSION

### 1. *Philip Morris Has Shown No Error with Respect to Its Liability for a Design Defect*

#### a. *Risk-benefit Test*

■ A product is defective in design for purposes of tort liability if the benefits of the design do not outweigh the risk of danger inherent in the design, or if the product, used in an intended or reasonably foreseeable manner, has failed to perform as safely as an ordinary consumer would expect. (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 418 [143 Cal.Rptr. 225, 573 P.2d 443].)

Philip Morris challenges the finding of liability for design defect based on a risk-benefit theory by challenging the sufficiency of the evidence that a safer alternative design existed and the sufficiency of the evidence that its failure to use a safer alternative design caused Bullock's injuries. Philip Morris's argument is based on the premise that a plaintiff alleging a design defect based on a risk-benefit theory must prove that the defendant could have used a safer alternative design. The jury, however, was not so instructed. The court instructed the jury to determine whether the benefits of the design outweighed the risks by considering several factors, but did not instruct that any single factor was essential:[4] "In determining whether the benefits of the design outweigh its risks, you should consider, among other things, the gravity of the danger posed by the design, the likelihood that the danger would cause damage, the existence or nonexistence of warnings, the time of the manufacture, the financial cost of an improved design, and the adverse consequences to the product and the consumer that would result from an alternate design."

■ Thus, Philip Morris challenges the verdict based on a purported rule of law on which the jury was not instructed. We review the sufficiency of the

---

[4] In light of the instructions given and Philip Morris's failure to argue instructional error, we need not decide whether a product that presents a substantial risk of harm may be defective for purposes of tort liability even if no safer alternative design is feasible. (See *Barker v. Lull Engineering Co., supra,* 20 Cal.3d at p. 430, fn. 10.) We also need not discuss the allocation of the burden of proof on the issue of the existence of a product defect. (*Id.* at pp. 431–432.)

evidence to support a verdict under the law stated in the instructions given, rather than under some other law on which the jury was not instructed. (*Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1535 [254 Cal.Rptr. 492].) Each party in a civil proceeding must request complete and comprehensive instructions on its theory of the case; if a party fails to do so, the court ordinarily has no duty to instruct on its own motion. (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 950–951 [160 Cal.Rptr. 141, 603 P.2d 58], disapproved on another point in *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 574, fn. 4 [88 Cal.Rptr.2d 19, 981 P.2d 944]; *Finn v. G. D. Searle & Co.* (1984) 35 Cal.3d 691, 701–702 [200 Cal.Rptr. 870, 677 P.2d 1147].) The jury's responsibility is to decide factual issues and return a verdict in accordance with the law as instructed by the court. (*Null, supra,* at p. 1534; *Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 877 [242 Cal.Rptr. 184].) Absent instructional error, which Philip Morris does not argue, for an appellate court to review a verdict under a rule of law on which the jury was not instructed would allow reversal of a judgment on a jury verdict, requiring a retrial, even though neither the jury nor the court committed error. (*Null, supra,* at pp. 1534–1535.) Accordingly, we conclude that Philip Morris has shown no error with respect to the finding of liability for a design defect based on the risk-benefit test.

### b. *Consumer Expectations Test and Failure to Warn*

Philip Morris contends the dangers of smoking cigarettes were known to the ordinary consumer before July 1, 1969, and thereafter, and the jury's finding to the contrary was not supported by substantial evidence. We disagree. The evidence of Philip Morris's extensive efforts, through various means, to mislead the public about the adverse health effects of smoking cigarettes and create a false controversy as to whether smoking caused lung cancer and other diseases, and evidence that smokers are particularly vulnerable to such manipulation, is sufficient to support the finding that the ordinary consumer was misled and was unaware of the dangers of cigarette smoking.

### 2. *Substantial Evidence Supports the Findings of Liability for Intentional Misrepresentation and False Promise Verdicts*

Philip Morris contends the evidence fails to establish that Bullock heard and actually relied on a false statement by Philip Morris and therefore does not support liability for intentional misrepresentation or false promise. Philip Morris cites cases holding that fraud must be alleged with particularity as support for the proposition that a plaintiff must prove that he or she actually relied on a particular statement by the defendant or by a third party repeating the substance of the defendant's statement. Philip Morris contends Bullock

failed to prove that she actually relied on a particular statement that was shown to be false at trial because she did not testify that she heard any of those statements.

As this record reflects, Bullock presented substantial evidence of extensive efforts by Philip Morris, sometimes in concert with other cigarette manufacturers, to mislead the public about the adverse health effects of smoking cigarettes through press releases, publications, advertising, and other means. Philip Morris sought to cast doubt on reports of adverse health effects by creating a false controversy as to whether smoking caused lung cancer and other diseases. Philip Morris, individually and through agents and trade associations, discredited the studies showing that smoking was likely a cause of serious illnesses and sought to reassure smokers that Philip Morris and other cigarette manufacturers were sponsoring research to resolve the purported controversy and that the research would be overseen by disinterested scientists.

Substantial evidence shows that contrary to those representations, Philip Morris knew that there was no valid scientific controversy concerning the adverse health effects of smoking, that it carefully avoided conducting or sponsoring research that might reveal the health hazards of smoking and concealed the results of research conducted in Germany on its behalf, and that it sought to maintain the false controversy and to make its cigarettes more addictive in order to increase sales. Philip Morris does not challenge the jury's findings that Philip Morris made one or more material misstatements of fact and false promises with the intention of inducing reliance, or the finding that Bullock's reliance was justified. Philip Morris's sole challenge to the intentional misrepresentation and false promise verdicts is that Bullock failed to prove that she actually relied on particular statements.

■ A plaintiff need not prove that he or she directly heard a specific misrepresentation or false promise to establish actual reliance. Rather, actual reliance is established if the defendant made a misrepresentation to a third party, the defendant intended or had reason to expect that the substance of the communication would be repeated to the plaintiff and would induce the plaintiff's reliance, and the plaintiff was misled when the substance of the communication was repeated to the plaintiff. (*Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1095–1098 [23 Cal.Rptr.2d 101, 858 P.2d 568]; *Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1660 [26 Cal.Rptr.3d 638]; *Whiteley v. Philip Morris, Inc., supra,* 117 Cal.App.4th at pp. 680–681; see Rest.2d Torts, § 533.) We therefore reject the contention that Bullock must prove that she heard and actually relied on a specific representation and conclude that Philip Morris has not shown error.

Philip Morris's selective recitation of evidence focuses on whether Bullock was a direct or indirect recipient of specific representations. Philip Morris does not discuss the evidence tending to show that Philip Morris for many years engaged in a broad-based public campaign to disseminate misleading information and create a false controversy concerning the adverse health effects of smoking with the intention of causing smokers and potential smokers to rely on the substance of that misinformation, and that the substance of the misinformation reached Bullock indirectly through various means and media sources and caused her to begin and to continue smoking. We need not further discuss that evidence because by failing to challenge its sufficiency and failing to discuss the issue in any meaningful way, Philip Morris waives any challenge to the sufficiency of the evidence in those regards. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362]; *County of Solano v. Vallejo Redevelopment Agency* (1999) 75 Cal.App.4th 1262, 1274 [90 Cal.Rptr.2d 41].)

### 3. *Philip Morris Has Shown No Instructional Error with Respect to Fraudulent Concealment*

Philip Morris requested an instruction pursuant to BAJI No. 12.36 stating, in pertinent part, "A duty to disclose known facts arises where one party knows of material facts and also knows that such facts are neither known nor readily accessible to the other party." Bullock requested an instruction stating identical language. Philip Morris also requested an instruction pursuant to BAJI No. 12.37, stating, "Intentional concealment exists where a party: [¶] (1) Knows of defects in a product and intentionally conceals them, or [¶] (2) While under no duty to speak, nevertheless does so, but does not speak honestly or makes misleading statements or suppresses facts which materially qualify those stated." Bullock requested an instruction stating only the second of the two enumerated alternatives, in language otherwise identical to the instruction requested by Philip Morris.

The court did not instruct the jury on BAJI No. 12.36, but instructed on BAJI No. 12.37 using the language requested by Philip Morris.[5] The reason for the court's failure to instruct on BAJI No. 12.36 does not appear in the appellate record. The conference on jury instructions was held in chambers and was not reported. No final set of written instructions showing the instructions given and refused appears in the record. There is no indication on either party's proposed instruction on BAJI No. 12.36 that the court refused

---

[5] The reporter's transcript indicates that in instructing the jury the court stated "makes misleading statements or *expresses* facts which materially qualify those stated" (italics added) rather than "makes misleading statements or *suppresses* facts which materially qualify those stated" (italics added). The record does not show that either party attempted to correct the apparent misstatement or that either party attempted to correct the reporter's transcript.

the instruction. Philip Morris represented to the court after the jury instruction conference that it would file a document showing Philip Morris's proposed instructions refused by the court. The document later filed by Philip Morris stated that Philip Morris "objected, and objects, to each and every rejection by the Court of jury instructions proposed by Philip Morris," but did not identify the instructions refused by the court. Moreover, Philip Morris did not argue in its new trial motion that the court erroneously refused to instruct on BAJI No. 12.36, so the court had no opportunity to address that argument.

The possible explanations for the court's failure to give an instruction requested by both parties include that the court concluded that the instruction was improper, that one or both parties withdrew its request for the instruction and objected to the instruction during the unrecorded conference, that the parties or the court concluded that the instruction was unnecessary, or that the court or the party who prepared the final set of instructions simply over-looked the requested instruction and mistakenly omitted it.[6] We cannot conclude from the appellate record whether one of these alternatives or some other scenario actually took place.

An appellant has the burden to provide a record sufficient to support its claim of error. (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 132 [87 Cal.Rptr.2d 132, 980 P.2d 846].) Absent an indication in the record that an error occurred, we must presume that there was no error. (*Walling v. Kimball* (1941) 17 Cal.2d 364, 373–374 [110 P.2d 58]; *Gee v. American Realty & Construction, Inc.* (2002) 99 Cal.App.4th 1412, 1416 [122 Cal.Rptr.2d 167].) An appellant arguing instructional error must ensure that the appellate record includes the instructions given and refused and the court's rulings on proposed instructions. (*Lynch v. Birdwell* (1955) 44 Cal.2d 839, 846–847 [285 P.2d 919];[7] *Huber, Hunt & Nichols, Inc. v. Moore* (1977) 67 Cal.App.3d 278, 312 [136 Cal.Rptr. 603].) If the record does not show which party requested an erroneous instruction, the reviewing court must presume that the appellant requested the instruction and therefore cannot complain of error. (*Lynch, supra*, at pp. 846–848.) Similarly, if the record does not show whether an instruction was refused or "withdrawn, abandoned, or lost in the shuffle," the reviewing court must presume that the appellant withdrew the instruction. (*Huber, Hunt & Nichols, supra*, at p. 312.) "[I]t is incumbent upon . . . appellant . . . to make certain that the trial court has

---

[6] The reporter's transcript shows that Philip Morris assumed responsibility for preparing the final set of instructions.

[7] "As declared in *Vaughn v. Jonas* (1948), 31 Cal.2d 586, 596 [191 P.2d 432], in making up the record on appeal 'Each instruction should be identified by a number and should indicate by whom it was requested or that it was given by the court of its own motion; on each requested instruction the trial judge should endorse the fact as to whether it was given or refused or given as modified, with the modification, if any, clearly indicated.' [Citation.]" (*Lynch v. Birdwell, supra*, 44 Cal.2d at pp. 846–847.)

ruled [on a requested instruction] and that the record on appeal discloses that ruling before the alleged ruling may be assigned as error. [Citations.]" (*Ibid.*)

We conclude that the record is insufficient to show that the court refused the requested instruction. We presume that Philip Morris either affirmatively withdrew the instruction or omitted the instruction from the final set of instructions that Philip Morris prepared.[8] Accordingly, Philip Morris has not shown instructional error with respect to fraudulent concealment.[9]

### 4. *Philip Morris Has Shown No Error with Respect to Preemption*

#### a. *Applicable Federal Law*

The Federal Cigarette Labeling and Advertising Act (FCLAA) (15 U.S.C. § 1331 et seq.) is "a comprehensive federal scheme governing the advertising and promotion of cigarettes." (*Lorillard Tobacco Co. v. Reilly* (2001) 533 U.S. 525, 541 [150 L.Ed.2d 532, 121 S.Ct. 2404] (*Reilly*); accord, 15 U.S.C. § 1331 [stating the purpose of the act is "to establish a comprehensive Federal Program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health"].) The express purposes of the act are to adequately inform the public of the dangers of smoking cigarettes and to protect the national economy from the burden of "diverse, nonuniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health." (15 U.S.C. § 1331.)

As originally enacted in 1965 (Pub.L. No. 89-92 (July 27, 1965) 79 Stat. 282), the FCLAA mandated warnings on cigarette packages, preserved the authority of the Federal Trade Commission (FTC) to regulate unfair or deceptive acts or practices in cigarette advertising, and included a preemption provision. The Public Health Cigarette Smoking Act of 1969 (Pub.L. No. 91-222 (Apr. 1, 1970) 84 Stat. 87) amended the FCLAA in several

---

[8] Philip Morris encountered a similar problem and suffered a similar result in *Boeken v. Philip Morris, Inc., supra*, 127 Cal.App.4th at pages 1671–1672.

[9] Our conclusion with respect to this claim of instructional error necessarily disposes of Philip Morris's related argument that it had no duty to disclose the fact that smoking causes lung cancer because information that smoking causes lung cancer was readily accessible to Bullock. The court never instructed the jury pursuant to BAJI No. 12.36 that a duty to disclose material facts arises only if a party knew that the facts were not readily accessible to another party, as discussed *ante*. Instead, the court only instructed pursuant to BAJI No. 12.37 that a party is liable for intentional concealment if the party "[k]nows of defects in a product and intentionally conceals them" or "[w]hile under no duty to speak, nevertheless does so, but does not speak honestly or makes misleading statements or expresses [*sic*] facts which materially qualify those stated." In light of the instructions given, Philip Morris has shown no error. (*Null v. City of Los Angeles, supra*, 206 Cal.App.3d at p. 1535.)

ways, including by strengthening the required warning and modifying the preemption provision. (*Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 514–515 & fn. 9 [120 L.Ed.2d 407, 112 S.Ct. 2608] (*Cipollone*).)[10] The preemption provision as amended in 1969 now reads, "No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter."[11] (15 U.S.C. § 1334(b).) A majority of the justices in *Cipollone* held that in light of the express preemption provisions enacted in 1965 and 1969, the scope of preemption under each provision is limited to claims expressly preempted under each provision. (*Cipollone, supra,* at p. 517.) Invoking a presumption against preemption of state laws based on the exercise of police powers, the *Cipollone* court stated that Congress's intent to preempt must be " 'clear and manifest.' " (*Id.* at pp. 516, 518; accord, *Reilly, supra,* 533 U.S. at pp. 541–542.)

■ A majority of the justices in *Cipollone* concluded that the phrase "[n]o requirement or prohibition . . . imposed under State law" in the current preemption provision (15 U.S.C. § 1334(b)) encompasses regulation both by positive enactments and by common law rules. The plurality opinion by Justice Stevens stated with regard to "requirement or prohibition": "As we noted in another context, '[state] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.' [Citation.]" (*Cipollone, supra,* 505 U.S. at p. 521 (plur. opn. of Stevens, J.).) The plurality also concluded that "under State law," as used in the statute, is not limited to positive enactments. (*Id.* at pp. 522–523.) Justices Scalia and Thomas agreed with these points in a separate opinion. (*Id.* at pp. 548–549 (conc. & dis. opn. of Scalia, J.).)

A plurality of the *Cipollone* court held that section 1334(b) of title 15 of the United States Code preempted state law claims based on failure to warn of the health hazards of smoking to the extent the claims required a showing that the defendants' advertising or promotions after 1969 "should have included additional, or more clearly stated, warnings." (*Cipollone, supra,* 505 U.S. at p. 524 (plur. opn. of Stevens, J.).) The plurality also held that section 1334(b) preempted state law claims for fraudulent misrepresentation based on statements in advertising and promotional materials that minimized

[10] The lead opinion in *Cipollone, supra,* 505 U.S. 504, by Justice Stevens was the majority opinion as to parts I through IV and a plurality opinion joined in by three other justices as to parts V and VI. Our references to parts V and VI of the opinion will indicate that we are referring to the plurality opinion.

[11] The amendment became effective on July 1, 1969. (Pub.L. No. 91-222, § 3, 84 Stat. 88.)

the health hazards of smoking and neutralized the required warnings. (*Cipollone, supra,* at pp. 527–528 (plur. opn. of Stevens, J.).) The plurality opinion explained that a fraudulent misrepresentation claim based on such a neutralization theory "is predicated on a state-law prohibition against statements in advertising and promotional materials that tend to minimize the health hazards associated with smoking. Such a *prohibition,* however, is merely the converse of a state-law *requirement* that warnings be included in advertising and promotional materials." (*Id.* at p. 527.) The plurality concluded that the plaintiff's fraudulent misrepresentation claim based on a neutralization theory was "inextricably related" to the failure to warn theory and therefore was preempted. (*Id.* at p. 528.)

The *Cipollone* plurality, however, held that section 1334(b) of title 15 of the United States Code did not preempt the plaintiff's state law claims for fraudulent misrepresentation based on false statements of material fact made in advertising because "[s]uch claims are predicated not on a duty 'based on smoking and health' but rather on a more general obligation—the duty not to deceive." (*Cipollone, supra,* 505 U.S. at pp. 528–529 (plur. opn. of Stevens, J.).) The plurality also held that the act did not preempt state law claims for breach of express warranty (*id.* at pp. 525–527) and conspiracy to misrepresent or conceal material facts (*id.* at p. 530).

The United States Supreme Court in *Reilly, supra,* 533 U.S. at pages 548–551, held that section 1334(b) of title 15 of the United States Code preempted Massachusetts's regulations restricting outdoor and point-of-sale advertising of cigarettes.[12] The court concluded, "Congress prohibited state cigarette advertising regulations motivated by concerns about smoking and health," and "the concern about youth exposure to cigarette advertising is intertwined with the concern about cigarette smoking and health." (*Reilly, supra,* at p. 548.) *Reilly* stated, "to the extent that Congress contemplated additional targeted regulation of cigarette advertising, it vested that authority in the FTC" (*ibid.*), and "Congress enacted a comprehensive scheme to address cigarette smoking and health in advertising and pre-empted state regulation of cigarette advertising that attempts to address that same concern, even with respect to youth." (*Id.* at p. 571.) *Reilly* also stated, "we hold only that the FCLAA pre-empts state regulations targeting cigarette advertising. States remain free to enact generally applicable zoning regulations, and to regulate conduct with respect to cigarette use and sales." (*Id.* at p. 550; see

---

[12] The attorney general of Massachusetts promulgated the regulations, in the words of the regulations themselves, " 'to eliminate deception and unfairness in the way cigarettes and smokeless tobacco products are marketed, sold and distributed in Massachusetts in order to address the incidence of cigarette smoking and smokeless tobacco use by children under legal age . . . [and] in order to prevent access to such products by underage consumers.' [Citation.]" (*Reilly, supra,* 533 U.S. at p. 533.)

also *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1271–1275 [63 Cal.Rptr.3d 418, 163 P.3d 106] [analyzing *Cipollone* and *Reilly*].)

### b. *Admission of Evidence*

Philip Morris filed motions in limine before trial seeking to preclude the admission of evidence pertaining to its advertising and promotion of cigarettes after July 1, 1969. Philip Morris argued that the evidence was inadmissible to support claims preempted by the FCLAA, was relevant for no other purpose and, *therefore*, was inadmissible for all purposes. The court concluded that the act did not preempt Bullock's product liability claims or fraud claims based on deceptive advertising, determined that the evidence was relevant and admissible for purposes of those claims, and denied the motions. During trial, Philip Morris objected to evidence of its post-1969 advertising on grounds of preemption. The court overruled the objections.

■ Philip Morris argues in its opening brief on appeal that the admission of evidence of its advertising after July 1, 1969, was error because the federal act preempts liability based on advertising that minimizes health risks or targets youths. Philip Morris's argument appears to be that such preemption made the evidence relied upon by Bullock inadmissible for all purposes. Evidence, however, may be admissible for one purpose but inadmissible for another purpose. (Evid. Code, § 355.) In its opening brief, Philip Morris does not challenge the court's rulings that the evidence was admissible for purposes of Bullock's product liability claims and fraud claims based on deceptive advertising. Bullock argues in her respondent's brief that the evidence was admissible for purposes other than the preempted claims and cites the court's rulings to that effect. Philip Morris argues in its reply brief that Bullock has waived the issue by failing to explain the purposes for which the evidence was admissible and argues summarily that the evidence was inadmissible for all purposes, but does not acknowledge the court's determination that the evidence was admissible to prove those claims not preempted by the FCLAA; nor does Philip Morris explain why that ruling was incorrect.

Evidence of Philip Morris's post-1969 advertising was admissible to support nonpreempted claims, including the counts for misrepresentation and false promise. Those counts were not "based on smoking and health" (15 U.S.C. § 1334(b)) because they were not based on either a positive enactment or a common law "prohibition against statements in advertising and promotional materials that tend to minimize the health hazards associated with smoking." (*Cipollone, supra,* 505 U.S. at pp. 527–528 (plur. opn. of Stevens, J.).) Rather, the counts for misrepresentation and false promise were based on false statements and a duty not to deceive and therefore were not preempted. Philip Morris's post-1969 advertising conveyed the message that

smokers were glamorous, healthy, and carefree and supported Philip Morris's efforts to deceive smokers and potential smokers concerning the adverse health effects of smoking. Evidence of Philip Morris's post-1969 advertising therefore was probative on the intent to defraud and reliance elements of Bullock's nonpreempted fraud claims.

Because Philip Morris has not shown that evidence of its post-1969 advertising was inadmissible for *all* purposes and the trial court properly concluded that such evidence was admissible in support of Bullock's fraud claims, we hold that there was no error in its admission.[13]

### c. *The Refusal of Philip Morris's Proposed Preemption Instructions in the First Phase of Trial Was Not Error*

Philip Morris filed a set of proposed jury instructions on May 23, 2002, including an instruction on preemption.[14] Philip Morris filed a second set of "Proposed Jury Instructions" on August 19, 2002, including a modified preemption instruction. Philip Morris filed a set of "Proposed Supplemental Preliminary Jury Instructions" on August 21, 2002, including a modified version of the preemption instruction. Philip Morris filed a set of "Revised Proposed Jury Instructions" on August 28, 2002, expressly withdrawing the proposed instructions filed on August 19. The revised set included a preemption instruction identical to the instruction proposed on August 21.[15]

---

[13] Philip Morris does not argue on appeal that the evidence should have been excluded under Evidence Code section 352.

[14] The proposed instruction stated in relevant part, "Federal law also limits claims based on advertising and promotion of cigarettes after July 1, 1969. With one exception that I will tell you about, you cannot find liability or award damages based on any claim that the advertising or promotion of cigarettes was wrongful or inappropriate after July 1, 1969. You cannot find liability or award damages based on any claim that the effect of the required warnings was neutralized, diminished or undermined by the imagery or implied messages contained in advertising or promotion of cigarettes after July 1, 1969. You cannot find liability or award damages based on a claim that advertising or promotion of cigarettes was targeted or directed at underage youth after July 1, 1969. [¶] There is one exception to the rule that liability or damages cannot be based on advertising or promotion of cigarettes. Federal law does not limit a claim that advertising or promotion of cigarettes contains a false statement of fact."

[15] The instruction proposed on August 28, 2002, stated, "Federal law limits the claims that plaintiff can make in this case. The United States Congress has required that tobacco companies, including defendant Philip Morris, put specific warning labels on every pack of cigarettes sold in the United States since 1966, and on brand advertisements for its cigarettes since 1971. [¶] The law also says that, since July 1, 1969, the required warnings are legally sufficient to warn the public, including smokers, of any harmful effects of smoking, including addiction. That means that you cannot find liability, award damages or punish the defendant in this case based on any claim that, after July 1, 1969: [¶] • Philip Morris should have provided more or different information to the public about the health risks of smoking or the addictive nature of smoking. [¶] • Philip Morris concealed or suppressed information about the health risks of smoking or the addictive nature of smoking. [¶] • Philip Morris' advertising or

Philip Morris then filed a set of "Supplemental Proposed Jury Instructions" on September 24, 2002, including two modified instructions on preemption. In that final set of proposed instructions, Philip Morris stated that the court held jury instruction conferences off the record on August 29 and September 11, 18, and 19, 2002, and that the attached instructions were proposed as alternatives to instructions previously submitted by Philip Morris and rejected by the court. The conferences on instructions were unrecorded, and no final set of instructions given and refused appears in the appellate record, as we have noted. The court instructed the jury that Philip Morris's liability for fraudulent concealment and liability for failure to warn of a design defect were limited to acts and omissions prior to July 1, 1969, but did not instruct that other counts were similarly restricted.

Philip Morris contends the court erred by refusing to instruct that liability for misrepresentation and false promise could not be based on advertising after July 1, 1969, that minimized health risks or targeted youths. In its opening brief, Philip Morris quotes only the fourth sentence of its proposed instruction filed on May 23, 2002 (quoted *ante* in fn. 14), fails to mention its later proposed instructions, and argues without citation to the record that the court "refused to give the jury any preemption instructions relating to plaintiff's misrepresentation and false promise claims." Bullock argues in her respondent's brief that Philip Morris fails to cite or discuss its revised proposed instruction filed on August 28, 2002, that the instruction was argumentative and confusing and the court properly refused it, and that Philip Morris has waived any error by failing to show that the requested instruction was proper.[16] In its reply brief, Philip Morris acknowledges that the proposed instruction filed on May 23 was superseded, but argues that the proposed instruction filed on August 28 was substantially the same. Philip Morris cites the August 28 proposed instruction in its reply brief, but does not discuss it or explain why it was proper. Philip Morris does not respond to the argument that the instruction was argumentative and confusing or the argument that Philip Morris has waived any error by failing to explain why the instruction was proper.

 A party is entitled to an instruction on each theory of the case that is supported by the pleadings and substantial evidence if the party requests a proper instruction. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 [34 Cal.Rptr.2d 607, 882 P.2d 298] (*Soule*); *Munoz v. City of Union City* (2004) 120 Cal.App.4th 1077, 1107–1108 [16 Cal.Rptr.3d 521].) A court may

---

promotion of cigarettes was wrongful or inappropriate after July 1, 1969. [¶] There is one exception to the rule that liability or damages cannot be based on advertising or promotion of cigarettes after July 1, 1969. Federal law does not limit a claim that advertising or promotion of cigarettes contains a false statement of fact."

[16] Bullock acknowledges that the court refused the proposed instruction filed on August 28, 2002. The proposed instruction bears the handwritten notation "refused."

refuse a proposed instruction that incorrectly states the law or is argumentative, misleading, or incomprehensible to the average juror, and ordinarily has no duty to modify a proposed instruction. (*Shaw v. Pacific Greyhound Lines* (1958) 50 Cal.2d 153, 158 [323 P.2d 391]; *Boeken v. Philip Morris Inc., supra,* 127 Cal.App.4th at p. 1678; *Munoz v. City of Union City, supra,* at p. 1108; *Levy-Zentner Co. v. Southern Pac. Transportation Co.* (1977) 74 Cal.App.3d 762, 782 [142 Cal.Rptr. 1].) A court may refuse a proposed instruction if other instructions given adequately cover the legal point. (*Arato v. Avedon* (1993) 5 Cal.4th 1172, 1185, fn. 11 [23 Cal.Rptr.2d 131, 858 P.2d 598].) Moreover, the refusal of a proper instruction is prejudicial error only if " 'it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" (*Soule, supra,* at p. 580.) "[W]hen deciding whether an error of instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled. [Fn. omitted.]" (*Id.* at pp. 580–581.)

An appealed judgment or challenged ruling is presumed correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193]; *Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632 [80 Cal.Rptr.2d 378].) An appellant must affirmatively demonstrate error through reasoned argument, citation to the appellate record, and discussion of legal authority. (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115–1116 [75 Cal.Rptr.2d 27]; *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [21 Cal.Rptr.2d 834].) Accordingly, we cannot conclude that the refusal to give an instruction was error absent an adequate showing that the proposed instruction was proper. (*Kritzer v. Citron* (1950) 101 Cal.App.2d 33, 39 [224 P.2d 808].) The extent of the showing required to demonstrate error depends on the complexity of the issues presented. Philip Morris's proposed instruction of August 28, 2002, addressed complex legal issues and ran over 200 words. By failing to discuss the entire instruction and failing to explain why it was proper, Philip Morris fails to carry its burden to demonstrate error.

Moreover, the instructions given on each count obviated the need for a more general preemption instruction of the type proposed. The court instructed the jury that Philip Morris's liability for fraudulent concealment and liability for failure to warn of a design defect were limited to acts and omissions prior to July 1, 1969. The court also instructed that an essential element of the counts for negligent and intentional misrepresentation was a false representation of fact or actionable opinion, and that Philip Morris could be held liable for false promise only if it made a promise that it did not intend to perform. The counts for misrepresentation and false promise were not " 'based on smoking and health' " within the meaning of the preemption provision because they were not based on either a positive enactment or a common law "prohibition against statements in advertising and promotional

materials that tend to minimize the health hazards associated with smoking."
(*Cipollone, supra,* 505 U.S. at pp. 527–528 (plur. opn. of Stevens, J.).)
Rather, the counts for misrepresentation and false promise were based on
false statements and a duty not to deceive and therefore were not subject to
preemption. By limiting liability for failure to warn or fraudulent conceal-
ment to acts and omissions before July 1, 1969, and by requiring a finding of
a misrepresentation of fact or actionable opinion or a false promise to support
liability for misrepresentation or false promise, the instructions given pre-
cluded liability based on a claim that Philip Morris's advertising or promo-
tion after July 1, 1969, either "should have included additional, or more
clearly stated, warnings" (*Cipollone, supra,* 505 U.S. at p. 524 (plur. opn. of
Stevens, J.)) or minimized the health hazards associated with smoking and
neutralized the required warnings. We conclude that Philip Morris's requested
instruction was unnecessary, that it unduly repeated and emphasized a
defense, that it was verbose and confusing, and that the court properly
refused it.

### d. *The Refusal of Philip Morris's Proposed Preemption Instructions in the Punitive Damages Phase of Trial Was Not Error*

Philip Morris proposed additional instructions on preemption in the puni-
tive damages phase of trial. Proposed instruction II stated, "You may not
impose punitive damages based on defendant's advertising and promotion of
cigarettes after July 1, 1969 depicting cigarettes in a positive light, including
depiction of smoking as enjoyable, where such advertising or promotion does
not contain a specific affirmative misrepresentation of fact." Proposed instruc-
tion JJ stated, "You may not impose punitive damages based on any finding
that defendant attempted to direct advertising or promotion of cigarettes to
underage or youth smokers." The court refused both proposed instructions on
the record. Philip Morris contends the refusal of the two instructions was
error.

The court instructed the jury in the first phase of trial that Philip Morris's
liability for fraudulent concealment and failure to warn of a design defect was
limited to acts and omissions prior to July 1, 1969, and that Philip Morris
could be held liable for misrepresentation or false promise only if it misrep-
resented a material fact or actionable opinion or made a promise that it had
no intention to perform, as stated *ante.* The court also instructed the jury in
the second phase not to award punitive damages based on a failure to warn
about the health risks of cigarettes. We conclude that those instructions
adequately encompassed the rule of law stated in proposed instruction II, that
liability for punitive damages could not be based on advertising or promotion
after July 1, 1969, absent an affirmative misrepresentation of fact. We
therefore conclude that the refusal of the proposed instruction was not error.

Proposed instruction JJ was based on *Reilly, supra*, 533 U.S. 525, and *Cipollone, supra*, 505 U.S. 504. *Reilly* held that the FCLAA preempted state law cigarette advertising regulations motivated by concerns about the health hazards of smoking, including regulations designed to restrict smoking by youths. (*Reilly, supra*, 533 U.S. at pp. 548–551.) *Reilly* involved positive enactments—regulations—rather than common law claims for damages and did not discuss preemption in the context of common law claims. *Cipollone* involved common law claims. A majority of the justices in *Cipollone* concluded that a common law claim is a " 'requirement or prohibition . . . imposed under State law' " within the meaning of the preemption provision (15 U.S.C. § 1334(b)). (*Cipollone, supra*, 505 U.S. at pp. 521–524 (plur. opn. of Stevens, J.); see *id.* at pp. 548–549 (conc. & dis. opn. of Scalia, J.).) A plurality of the justices in *Cipollone* held that section 1334(b) preempted state law claims based on failure to warn of the health hazards of smoking to the extent the claims required a showing that the defendants' advertising or promotions after 1969 "should have included additional, or more clearly stated, warnings." (*Cipollone, supra*, 505 U.S. at p. 524 (plur. opn. of Stevens, J.).) The plurality also held that section 1334(b) preempted state law claims for fraudulent misrepresentation based on statements in advertising and promotional materials that minimized the health hazards of smoking and neutralized the required warnings. (*Cipollone, supra*, 505 U.S. at pp. 527–528 (plur. opn. of Stevens, J.).) The plurality concluded that both types of claims were " 'based on smoking and health' " within the meaning of section 1334(b). (*Cipollone, supra*, 505 U.S. at pp. 524, 527–528 (plur. opn. of Stevens, J.).)

■ Proposed instruction JJ incorrectly stated the law because it precluded liability for punitive damages based on youth targeting activities that occurred *before or* after July 1, 1969, the effective date of the amended preemption provision (15 U.S.C. § 1334(b)). Section 1334(b) preempts claims based on advertising or promotional activities only to the extent that the claims are based on activities that occurred after July 1, 1969. (*Hearn v. R.J. Reynolds Tobacco Co.* (D.Ariz. 2003) 279 F.Supp.2d 1096, 1110–1111; *Cruz Vargas v. R.J. Reynolds Tobacco Co.* (D.P.R. 2002) 218 F.Supp.2d 109, 117, affd. (1st Cir. 2003) 348 F.3d 271; see *Cipollone, supra*, 505 U.S. at p. 524 (plur. opn. of Stevens, J.) [held that failure to warn claims were preempted only to the extent the claims arose from "post-1969 advertising or promotions"].) Thus, the trial court properly refused the instruction.

Moreover, it is clear that Bullock's misrepresentation and false promise claims against Philip Morris were not "based on smoking and health" within the meaning of the preemption provision. Those claims were not based on either a positive enactment or a common law "prohibition against statements in advertising and promotional materials that tend to minimize the health hazards associated with smoking" (*Cipollone, supra*, 505 U.S. at pp. 527–528

(plur. opn. of Stevens, J.)). Instead, the claims were based on false statements. The court instructed the jury that Philip Morris could be held liable for misrepresentation or false promise only if it misrepresented a material fact or actionable opinion or made a promise that it had no intention to perform. With respect to the misrepresentation and false promise claims, there was no need to instruct the jury not to award punitive damages based on youth targeting in the advertising or promotion of cigarettes because those claims were not based on youth targeting and a duty "based on smoking and health," but on a duty not to deceive. Therefore, apart from the reason already stated, the refusal of proposed instruction JJ was proper with respect to the counts for misrepresentation and false promise.

Finally, the court instructed the jury that Philip Morris's liability for fraudulent concealment and failure to warn of a design defect was limited to acts and omissions prior to July 1, 1969, so there was no need to instruct that those claims could not be based on advertising or promotional activities after that date that targeted youths. Again, Philip Morris has not shown error.

### 5. Remittitur Was a Proper Remedy for the Jury's Excessive Punitive Damages Award

Philip Morris challenges the punitive damages award under both California law and the Fourteenth Amendment due process clause. Philip Morris contends the $28 billion punitive damages award was excessive under California law, the jury acted out of passion and prejudice, and the *only* appropriate remedy is a new trial. The trial court, in ruling on Philip Morris's new trial motion, determined that the amount awarded by the jury *was* excessive and that $28 million was an appropriate amount.

Code of Civil Procedure section 662.5, subdivision (b) authorizes a court granting a new trial motion on the ground of excessive damages to make its order subject to the condition that the motion is denied if the plaintiff consents to a reduction of the award to an amount that the court independently determines to be fair and reasonable.[17] A court exercising this authority acts as an independent trier of fact. (*Ibid.*; *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 933 [148 Cal.Rptr. 389, 582 P.2d 980].) We must affirm the court's decision if the court states adequate reasons for the

---

[17] "In any civil action where after trial by jury an order granting a new trial limited to the issue of damages would be proper, the trial court may in its discretion: [¶] . . . [¶] (b) If the ground for granting a new trial is excessive damages, make its order granting the new trial subject to the condition that the motion for a new trial is denied if the party in whose favor the verdict has been rendered consents to a reduction of so much thereof as the court in its independent judgment determines from the evidence to be fair and reasonable." (Code Civ. Proc., § 662.5.)

decision and substantial evidence supports the decision. (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 412 [93 Cal.Rptr.2d 60, 993 P.2d 388]; *Neal, supra*, at pp. 931–933 & fn. 18.) "[W]hen a trial court grants a new trial on the issue of excessive damages, whether or not such order is conditioned by a demand for reduction, the presumption of correctness normally accorded on appeal to the jury's verdict is replaced by a presumption in favor of the order." (*Neal, supra*, at p. 932.) Accordingly, the relevant amount for purposes of our review is not the amount awarded by the jury, but the reduced amount ordered by remittitur. (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 419 [185 Cal.Rptr. 654, 650 P.2d 1171].)

Code of Civil Procedure section 662.5 compels the conclusion that a new trial was not the only appropriate remedy for the excessive jury verdict. Rather, a conditional new trial order with a remittitur resulting in the denial of the new trial motion was a proper alternative remedy. We conclude, however, that a new trial to determine the amount of punitive damages is required for another reason.

### 6. *The Refusal of Philip Morris's Proposed Instruction Prohibiting Punishment for Harm Caused to Others Was Error*

#### a. *Due Process Limitations on Punitive Damages*

The due process clause of the Fourteenth Amendment prohibits grossly excessive or arbitrary punishment of a tortfeasor and therefore limits the amount of punitive damages that a state court can award. (*State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408, 416–417 [155 L.Ed.2d 585, 123 S.Ct. 1513] (*State Farm*).) A court reviewing a punitive damages award under the due process clause must consider three constitutional guideposts: "(1) the degree of reprehensibility of the defendant's misconduct, (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. [Citation.]" (*Id.* at p. 418.) The first two guideposts are appropriate for a jury to consider in determining the amount of a punitive damages award; the third guidepost is an appropriate consideration only for a reviewing court. (*Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 959–960 [43 Cal.Rptr.3d 468]; cf. *Philip Morris USA v. Williams* (2007) 549 U.S. 346 [166 L.Ed.2d 940, 127 S.Ct. 1057, 1062, 1064] (*Williams*)

[emphasized the need to avoid an arbitrary determination of the amount of punitive damages and the need for procedures to ensure that the jury is properly guided].)[18]

The United States Supreme Court in *State Farm, supra,* 538 U.S. at page 419, stated: " '[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.' [*BMW of North America, Inc. v.*] *Gore* [(1996)] 517 U.S. [559,] 575 [134 L.Ed.2d 809, 116 S.Ct. 1589]. We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Id.,* at 576–577. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. *Id.,* at 575."

A state generally has no "legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction." (*State Farm, supra,* 538 U.S. at p. 421.) "A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction. [Citation.]" (*Id.* at p. 422.) Moreover, "[a] defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business. Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis . . . . Punishment on these bases creates the possibility of multiple punitive damages awards for the

---

[18] Under California law, a punitive damages award must be based on three factors: (1) the reprehensibility of the defendant's conduct; (2) the amount of compensatory damages awarded to or actual harm suffered by the plaintiff; and (3) the defendant's financial condition. (*Adams v. Murakami* (1991) 54 Cal.3d 105, 110 [284 Cal.Rptr. 318, 813 P.2d 1348]; *Neal v. Farmers Ins. Exchange, supra,* 21 Cal.3d at p. 928.) "[T]he defendant's financial condition remains a legitimate consideration in setting punitive damages . . ." after *State Farm, supra,* 538 U.S. 408, and *BMW of North America v. Gore, supra,* 517 U.S. 559. (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1185 [29 Cal.Rptr.3d 379, 113 P.3d 63] (*Simon*).)

same conduct . . . ."[19] (*Id.* at p. 423, citation omitted.) This does not mean, however, that the defendant's similar wrongful conduct toward others should not be considered in determining the amount of punitive damages. (*Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191, 1206–1208 & fn. 6 [29 Cal.Rptr.3d 401, 113 P.3d 82] (*Johnson*).)

The reprehensibility of the defendant's conduct toward the plaintiff depends in part on the "scale and profitability" of the course of conduct of which the defendant's conduct toward the plaintiff is a part. (*Johnson, supra,* 35 Cal.4th at pp. 1207–1208.) "[T]he court in *State Farm* noted that conduct involving 'repeated actions' was worse than, and could be punished more severely than, conduct limited to 'an isolated incident.' (*State Farm, supra,* [538 U.S.] at p. 419.) [Fn. omitted.]" (*Johnson, supra,* at p. 1206.) The *State Farm* court stated that even "[l]awful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff." (*State Farm, supra,* at p. 422.) The California Supreme Court in *Johnson* stated, "To consider the defendant's entire course of conduct in setting or reviewing a punitive damages award, even in an individual plaintiff's lawsuit, is not to punish the defendant for its conduct toward others. An enhanced punishment for recidivism does not directly punish the earlier offense; it is, rather, ' " 'a stiffened penalty for the last crime, which is considered to be an aggravated offense because a repetitive one.' " ' (*Ewing v. California* (2003) 538 U.S. 11, 25–26 [155 L.Ed.2d 108, 123 S.Ct. 1179].) . . . By placing the defendant's conduct on one occasion into the context of a business practice or policy, an individual plaintiff can demonstrate that the conduct toward him or her was more blameworthy and warrants a stronger penalty to deter continued or repeated conduct of the same nature." (*Johnson, supra,* at pp. 1206–1207, fn. 6.) *Johnson* stated further, "The scale and profitability of a course of wrongful conduct by the defendant cannot justify an award that is grossly excessive in relation to the harm done or threatened, but scale and profitability nevertheless remain relevant to reprehensibility and hence to the size of award warranted, under the guideposts, to meet the state's interest in deterrence. . . . Nothing the high court has said about due process review requires that California juries and courts ignore evidence of corporate policies and practices and evaluate the defendant's harm to the plaintiff in isolation." (*Id.* at p. 1207.)

The United States Supreme Court in *Williams, supra,* 549 U.S. 346 [127 S.Ct. 1057], held that a state court may not award punitive damages for

---

[19] *State Farm* held that the Utah courts erred by awarding punitive damages based on the defendant's dissimilar acts that "had nothing to do with" the conduct that injured the plaintiffs. (*State Farm, supra,* 538 U.S. at pp. 423–424.)

the purpose of punishing a defendant for harm caused to nonparties to the litigation. (*Id.* at p. ___ [127 S.Ct. at p. 1063].) *Williams* stated, "In our view, the Constitution's Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent . . . . "[20] (549 U.S. at p. ___ [127 S.Ct. at p. 1063].) *Williams* explained that a defendant would have no meaningful opportunity to defend against a charge of injury caused to others and that the jury would have to speculate as to the nature and extent of such injuries. (*Ibid.*) *Williams* stated that a jury may consider evidence of harms to others in determining the degree of reprehensibility, but stated that a jury cannot consider that evidence for the purpose of punishing the defendant: "Evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible . . . . Yet for the reasons given above, a jury may not go further than this and use a punitive damages verdict to punish a defendant directly on account of harms it is alleged to have visited on nonparties." (*Id.* at p. ___ [127 S.Ct. at p. 1064].) Thus, *Williams* distinguished (1) considering evidence of harm caused to others to determine the degree of *reprehensibility* (one of the three constitutional guideposts to determine the due process limits on the amount of a punitive damages award) of the conduct that harmed the plaintiff from (2) considering that same evidence for the purpose of *punishing* the defendant.

 *Williams* rejected the statement by the Oregon Supreme Court that " '[i]f a jury cannot punish for the conduct, then it is difficult to see why it may consider it at all.' " (*Williams, supra,* 549 U.S. at pp. ___–___ [127 S.Ct. at pp. 1064–1065].) *Williams* again distinguished considering harm caused to others to determine reprehensibility from considering that same evidence for the purpose of punishing the defendant: "We have explained why we believe the Due Process Clause prohibits a State's inflicting punishment for harm caused strangers to the litigation. At the same time we recognize that conduct that risks harm to many is likely more reprehensible than conduct that risks harm to only a few. And a jury consequently may take this fact into account in determining reprehensibility. [Citation.]" (*Id.* at p. ___ [127 S.Ct. at p. 1065].)

 *Williams* stated further: "How can we know whether a jury, in taking account of harm caused others under the rubric of reprehensibility, also seeks

---

[20] Similarly, *Williams* described the question presented and the court's holding as follows: "The question we address today concerns a large state-court punitive damages award. We are asked whether the Constitution's Due Process Clause permits a jury to base that award in part upon its desire to *punish* the defendant for harming persons who are not before the court (*e.g.,* victims whom the parties do not represent). We hold that such an award would amount to a taking of 'property' from the defendant without due process." (*Williams, supra,* 549 U.S. at p. ___ [127 S.Ct. at p. 1060].)

to *punish* the defendant for having caused injury to others? Our answer is that state courts cannot authorize procedures that create an unreasonable and unnecessary risk of any such confusion occurring. In particular, we believe that where the risk of that misunderstanding is a significant one—because, for instance, of the sort of evidence that was introduced at trial or the kinds of argument the plaintiff made to the jury—a court, *upon request*, must protect against that risk. Although the States have some flexibility to determine what *kind* of procedures they will implement, federal constitutional law obligates them to provide *some* form of protection in appropriate cases." (*Williams, supra,* 549 U.S. at p. ___ [127 S.Ct. at p. 1065], some italics added.)

### b. *Philip Morris's Proposed Instruction Was Not Improper and the Court's Refusal to Instruct Was Prejudicial Error*

Philip Morris contends the refusal of three of its proposed instructions on punitive damages was error. Proposed instruction V-1 stated, "You are not to impose punishment for harms suffered by persons other than the plaintiff before you." Proposed instruction V-2 stated, "You are not to punish defendant for the impact of its conduct on individuals in other states or countries." Proposed instruction AA stated, "You must consider Philip Morris' financial condition and ability to pay a punitive damages award as part of the process of arriving at an appropriate punishment. But you may not punish a defendant simply because it is large." The first of these proposed instructions bears a handwritten "Denied," the second bears in the same handwriting "Denied" and the judge's initials, and the third bears no indication of any ruling. Bullock acknowledges that the court refused the instructions. We conclude that the refusal of the first of these instructions was error.

A party is entitled to an instruction on each theory of the case supported by the pleadings and substantial evidence for which the party requests a proper instruction, as stated *ante.* (*Soule, supra,* 8 Cal.4th at p. 572; *Munoz v. City of Union City, supra,* 120 Cal.App.4th at pp. 1107–1108.) Proposed instruction V-1 expressed the rule of law later confirmed in *Williams,* that the jury could not award punitive damages for the purpose of punishing Philip Morris for harming nonparties to the litigation. (*Williams, supra,* 549 U.S. at pp. ___–___ [127 S.Ct. at pp. 1063–1065].)

 The fact that proposed instruction V-1 did not include the qualification that evidence of harm caused to others *could* be considered to determine the reprehensibility of the conduct that harmed Bullock did not render the instruction incomplete or misleading. *Williams* made it clear that imposing punishment for harm caused to others, which is prohibited, is separate and distinct from determining the degree of reprehensibility by considering evidence of harm caused to others, which is permitted. (*Williams, supra,*

549 U.S. at pp. ___–___ [127 S.Ct. at pp. 1063–1065].) A jury that considers evidence of harm caused to others to determine the reprehensibility of a defendant's conduct toward the plaintiff, for the purpose of determining the amount of a punitive damages award, is not imposing punishment for harm caused to others. (*Ibid.*) It is therefore appropriate to state without qualification that a jury may not "impose punishment" for harms suffered by nonparties to the litigation, as proposed instruction V-1 stated.

■ Philip Morris had no duty to qualify its proposed instruction in order to encompass a rule of law favorable to Bullock concerning the permissible use of evidence of harm caused to others. Each party in a civil case has a duty to propose instructions that accurately state the law supporting its own theory of the case, and need not qualify its proposed instructions for the benefit of an opposing party. (*Agarwal v. Johnson, supra,* 25 Cal.3d at pp. 949–951 [held that an instruction on punitive damages that correctly stated the law but could have been qualified was proper, and that the appellants waived their objection by failing to request a qualifying instruction]; *Menchaca v. Helms Bakeries, Inc.* (1968) 68 Cal.2d 535, 543 [67 Cal.Rptr. 775, 439 P.2d 903] ["Plaintiffs were not required to cover in their requested instructions each and every point favorable to defendant. If defendant had decided that further instruction about the statute would have been helpful, it could have submitted such an instruction. [Citations.]"]; *Hensley v. Harris* (1957) 151 Cal.App.2d 821, 825 [312 P.2d 414] ["Each party has a duty to propose instructions in the law applicable to his own theory of the case. He has no duty to propose instructions which relate only to the opposing theories of his adversary . . . ."].) Accordingly, we conclude that proposed instruction V-1 was not improper and that the court erred by refusing to give the instruction.

■ Evidence was presented at trial of Philip Morris's nationwide publicity campaign designed to mislead the public as to the adverse health effects of smoking cigarettes, as we have discussed. Evidence also was presented of the numbers of smokers in California who have died as a result of smoking cigarettes. Bullock's counsel emphasized that evidence in closing argument and referred to the numbers of people who were "lied to year after year" and who allegedly died as a result of smoking. He argued that for each lawsuit against Philip Morris for smoking-related illnesses, 28,000 Californians have died from smoking in the past 40 years. The $28 billion in punitive damages awarded by the jury was equivalent to $1 million for each of the purported 28,000 deaths. In light of this record, and absent any instruction providing

adequate guidance concerning evidence of harm caused to others, we conclude that the refusal of Philip Morris's proposed instruction V-1 was prejudicial.[21]

Proposed instruction V-2 was similar in effect to proposed instruction V-1. In light of our conclusion that the refusal to give the latter was prejudicial error, we need not decide whether the refusal to give the former was error.

As for proposed instruction AA, the court properly instructed the jury to consider the amount of punitive damages that would have a deterrent effect on Philip Morris in light of its financial condition. (See *Simon, supra,* 35 Cal.4th at pp. 1184–1185.) The first sentence of proposed instruction AA ("You must consider Philip Morris' financial condition and ability to pay a punitive damages award as part of the process of arriving at an appropriate punishment.") was substantially similar to the instruction given, so the refusal to give that part of the proposed instruction was not error. In our view, the second sentence of the proposed instruction ("But you may not punish a defendant simply because it is large.") also was encompassed in the same instruction given together with the instruction stating that "punitive damages must bear a reasonable relation to the injury, harm, or damage actually suffered by the plaintiff." Those instructions, taken together, adequately informed the jury that the amount of punitive damages cannot be based on the defendant's size alone, while properly stating that the defendant's financial condition is an appropriate consideration. Proposed instruction AA was properly rejected.

### 7. *A Remittitur by This Court Would Be Inappropriate*

Bullock contends the appropriate remedy for any instructional error with respect to punitive damages is for this court to reduce the amount of punitive damages awarded by the jury by way of remittitur. An appellate

---

[21] Although Philip Morris's proposed instruction need not have been qualified, a specific instruction encompassing both the permitted and prohibited uses of evidence of harm caused to others would be appropriate in the new trial if requested by the parties. We believe that an instruction on these issues should clearly distinguish between the permitted and prohibited uses of such evidence and thus make clear to the jury the purposes for which it can and cannot consider that evidence. A jury may consider evidence of harm caused to others for the purpose of determining the degree of reprehensibility of a defendant's conduct toward the plaintiff in deciding the amount of punitive damages, but it may not consider that evidence for the purpose of punishing the defendant directly for harm caused to others. (*Williams, supra,* 549 U.S. at pp. ___, ___ [127 S.Ct. at pp. 1064, 1065].) In our view, Judicial Council of California Civil Jury Instructions (Aug. 2007 rev.) CACI Nos. 3940, 3942, 3943, 3945, 3947, and 3949 could convey this distinction better by stating more explicitly that evidence of harm caused to others may be considered for the one purpose but not for the other, and by providing that explanation together with the reprehensibility factors rather than in connection with the reasonable relationship issue.

court may reduce the amount of an excessive damages award by issuing a remittitur that conditions affirmance of the judgment on the plaintiff's consent to the reduction. (See *Cunningham v. Simpson* (1969) 1 Cal.3d 301, 310 [81 Cal.Rptr. 855, 461 P.2d 39]; *Deevy v. Tassi* (1942) 21 Cal.2d 109, 120–121 [130 P.2d 389].) The use of a remittitur by a reviewing court is not limited to cases where the only error at trial was in the amount of the award. Rather, remittitur may be appropriate where instructional error resulted in an excessive award and the amount of the excess is ascertainable. (*Salstrom v. Orleans Bar Gold Min. Co.* (1908) 153 Cal. 551, 559 [96 P. 292]; *Conger v. White* (1945) 69 Cal.App.2d 28, 42–43 [158 P.2d 415].) Moreover, in *Stevens v. Snow* (1923) 191 Cal. 58, 68 [214 P. 968], disapproved on another ground in *Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1208–1211 [31 Cal.Rptr.2d 776, 875 P.2d 1279], the California Supreme Court issued a remittitur reducing by one-half the amount of a judgment based on instructional error and error in the admission of evidence despite the Supreme Court's express acknowledgment that it could not determine how the errors affected the amount of the judgment.

In this case, we cannot determine how the instructional error that we have found affected the amount of the punitive damages award and we cannot substitute our own assessment of the appropriate amount of punitive damages for that of a jury (or a judge on a new trial motion). We therefore conclude that a remittitur by this court would be inappropriate. A new trial limited to the *amount* of punitive damages is thus required.

### 8. *Scope of the New Trial*

A trial court ruling on a new trial motion may order a new trial on a limited issue if a trial on that issue alone would not prejudice any party. (*Liodas v. Sahadi* (1977) 19 Cal.3d 278, 285 [137 Cal.Rptr. 635, 562 P.2d 316]; *Leipert v. Honold* (1952) 39 Cal.2d 462, 466 [247 P.2d 324].) Similarly, an appellate court may order a new trial on a limited issue if a trial on that issue alone would not cause such uncertainty or confusion as to deny a fair trial. (*Brewer v. Second Baptist Church* (1948) 32 Cal.2d 791, 801 [197 P.2d 713]; see *Torres v. Automobile Club of So. California* (1997) 15 Cal.4th 771, 776 [63 Cal.Rptr.2d 859, 937 P.2d 290] (*Torres*).) The primary reasons to order a new trial limited to an issue, or issues, that can be determined separately without prejudice to any party are to relieve the trial court and the parties of the unnecessary burden of relitigating issues that have been decided, and to respect and preserve the results of a trial on issues as to which the appellant has not shown error. (*Leipert, supra,* at p. 466; *Barmas, Inc. v. Superior Court* (2001) 92 Cal.App.4th 372, 375–376 [112 Cal.Rptr.2d 71] (*Barmas*); see *Torres, supra,* at p. 776.) Whether an issue can be tried separately without prejudice to any party depends on the particular circumstances of each case. (*Brewer, supra,* at p. 801.) Any doubts as to whether a

new trial limited to damages is appropriate should be resolved in favor of a complete new trial. (*Liodas, supra,* at pp. 285–286; *Leipert, supra,* at pp. 466–467.)

The question whether a limited new trial is appropriate typically arises in cases involving excessive or inadequate compensatory damages. (See 8 Witkin, Cal. Procedure (4th ed. 1997) Attack on Judgment in Trial Court, § 114, pp. 618–619.) A new trial limited to determining the amount of compensatory damages ordinarily is proper unless the record indicates that the finding of liability resulted from a compromise verdict, in which case the new trial should encompass both liability and damages. (E.g., *Leipert v. Honold, supra,* 39 Cal.2d at p. 467; *Hughes v. Schwartz* (1942) 51 Cal.App.2d 362, 364–370 [124 P.2d 886].)

In *Liodas v. Sahadi, supra,* 19 Cal.3d 278, the California Supreme Court stated that the defendant's liability was correctly determined, but concluded that a new trial on compensatory and punitive damages must encompass liability as well. The trial court had instructed the jury on the measure of damages for fraud by a fiduciary, but refused an instruction on the measure of damages for ordinary fraud. (*Id.* at. pp. 283–284.) *Liodas* stated that there was conflicting evidence as to when the fiduciary relationship ended, and that it was impossible to determine whether the jury found the defendant liable for ordinary fraud or fraud by a fiduciary. (*Id.* at pp. 284, 286.) *Liodas* stated further that numerous transactions were alleged to be fraudulent, that the evidence was in conflict, and that it was impossible to determine which transactions the jury found fraudulent. (*Id.* at p. 286.) *Liodas* stated that before awarding damages, the second jury must determine whether the defendant was liable for fiduciary or ordinary fraud and must determine which transactions were fraudulent. (*Ibid.*) Because those issues must be redetermined in the new trial, *Liodas* concluded that the issue of liability was inseparable from the issue of damages, that a partial new trial would be prejudicial to the defendant, and that a new trial on all issues therefore was required. (*Ibid.*)

*Liodas v. Sahadi, supra,* 19 Cal.3d 278, is distinguishable from the present case because the new jury in *Liodas* had to determine which of the numerous transactions were fraudulent and whether the defendant was acting as a fiduciary at the time in order to apply the proper measure of compensatory damages to each transaction. Here, in contrast, there was no error in the award of compensatory damages, and the jury in the new trial on punitive damages need not make any finding with respect to liability in order to determine the proper measure of damages. Under California law and the federal due process clause, the jury awarding punitive damages in the new trial must consider the reprehensibility of Philip Morris's conduct, the amount

of compensatory damages or the harm suffered by Bullock, and Philip Morris's financial condition, as we have stated. The trial court has the discretion to admit evidence relevant to those considerations notwithstanding the fact that Philip Morris's liability for compensatory and punitive damages and the amount of compensatory damages have been established. (*Torres, supra*, 15 Cal.4th at p. 781, fn. 3; *Sharp v. Automobile Club of So. Cal.* (1964) 225 Cal.App.2d 648, 654 [37 Cal.Rptr. 585].)

*Torres* is instructive. The question presented in *Torres* was whether Civil Code section 3295, subdivision (d) entitled the defendant to a new trial on liability and compensatory damages following the reversal of an award of punitive damages and remand for a new trial on punitive damages. (*Torres, supra*, 15 Cal.4th at p. 775.) Section 3295, subdivision (d) states that evidence of the defendant's profit and financial condition must be presented to the same trier of fact that determined liability and found the defendant guilty of oppression, fraud, or malice. *Torres* concluded that section 3295, subdivision (d) applies only in a bifurcated trial, and does not apply in a new trial following a reversal. (*Torres, supra*, at pp. 778–780.) *Torres* concluded that section 3295, subdivision (d) requires the trier of fact that is presented evidence of the defendant's profit and financial condition in a bifurcated trial to be the same trier of fact that determined the defendant's liability and found the defendant guilty of oppression, fraud, or malice. (*Torres, supra*, at p. 778.) *Torres* distinguished the application of the statute in a bifurcated trial from the situation where an appellate court's reversal requires a new trial. *Torres* concluded that section 3295, subdivision (d) was not intended to deprive an appellate court of its authority to order a new trial limited to the issue of punitive damages, and held that the statute did not entitle the defendant to a new trial on liability and compensatory damages following the reversal of a punitive damages award. (*Torres, supra*, at pp. 779–780, 782.)

*Torres, supra*, 15 Cal.4th 771, acknowledged the authority of an appellate court to order a new trial on a limited issue (*id.* at pp. 776, 779–780), but did not decide whether the limited new trial ordered in that case was an appropriate exercise of that authority. *Torres* stated, however, "in the context of retrials, it generally is unnecessary for the same jury to determine liability and punitive damages in order to ensure a reasonable relation between actual and punitive damages." (*Id.* at p. 781.) *Torres* stated further, quoting from *Brewer v. Second Baptist Church, supra*, 32 Cal.2d at page 802: " 'Upon a retrial of the issue of exemplary damages the jury can maintain that reasonable relation between general and exemplary damages without having to determine for itself the amount of general damages. The amount of general damages has been properly determined by the first jury. Upon a retrial of the issue of exemplary damages it is only necessary for the second jury to be advised of the amount of general damages already awarded in order that it may maintain a reasonable relation between such damages and

the exemplary damages, if any, that it awards. If it fails to do so and awards excessive exemplary damages, there is an adequate remedy by way of an appropriate motion before the trial court or by appeal.' (32 Cal.2d at p. 802.) In short, because there are adequate safeguards for ensuring that the jury in a limited retrial can maintain a reasonable relationship between actual and punitive damages, there ordinarily is no need for a complete retrial to guard against an excessive punitive damages award." (*Torres, supra,* 15 Cal.4th at p. 781, fn. omitted.)

Philip Morris argues that a punitive damages award in a new trial must be based on the same conduct that the jury in the first trial found was committed with oppression, fraud, or malice, and that absent a clear indication of the particular conduct that the jury found to be punishable, the jury in the new trial might base a punitive damages award on conduct that the prior jury did not find oppressive, fraudulent, or malicious. Language in *Medo v. Superior Court* (1988) 205 Cal.App.3d 64 [251 Cal.Rptr. 924] (*Medo*) and *Barmas, supra,* 92 Cal.App.4th 372, could be construed to support this view to some degree.

*Medo, supra,* 205 Cal.App.3d 64, involved a bifurcated trial in which the jury was discharged prematurely before the punitive damages phase. The trial court ordered punitive damages to be tried before a new jury. (*Id.* at pp. 66–67.) *Medo* concluded that Civil Code section 3295, subdivision (d) required the same jury to determine both liability and the amount of punitive damages. (*Medo, supra,* at p. 68.) *Medo* stated: "Punitive damages are not simply recoverable in the abstract. They must be tied to oppression, fraud or malice *in the conduct which gave rise to liability in the case.* Thus BAJI No. 14.71, the instruction on punitive damages, tells the jury that in arriving at an award of punitive damages, it is to consider the reprehensibility of the conduct of the defendant and that the punitive damages must bear a reasonable relation to the actual damages. In order for a jury to evaluate the oppression, fraud or malice in the conduct giving rise to liability in the case, it must consider the conduct giving rise to liability." (*Id.* at p. 68.) *Medo* held, however, that the defendant waived the same-trier-of-fact requirement by failing to timely object to a separate jury. (*Id.* at pp. 69–70.)

*Torres* quoted the above quoted passage from *Medo, supra,* 205 Cal.App.3d 64, and stated, "We are not persuaded." (*Torres, supra,* 15 Cal.4th at p. 780.) *Torres* distinguished *Medo* on the ground that *Medo* involved an improperly discharged jury in a bifurcated trial rather than a partial retrial following a reversal on appeal. (*Torres, supra,* at p. 780.) *Torres* expressly stated no opinion whether *Medo* was correctly decided, but stated that even if *Medo* were correct, Civil Code section 3295, subdivision (d) did not "upset settled law regarding the power of appellate courts to affirm the liability and

compensatory damage aspects of a judgment while ordering a retrial limited to punitive damages." (*Torres, supra,* at pp. 780–781.)

*Barmas, supra,* 92 Cal.App.4th 372, involved a bifurcated trial in which the jury deadlocked on the issue of malice. The trial court ordered a new trial on the issue of malice and, if appropriate, punitive damages. (*Id.* at pp. 374–375.) *Barmas* rejected the defendant's argument that Civil Code section 3295, subdivision (d) required a new trial on liability as well, citing *Torres, supra,* 15 Cal.4th 771. *Barmas* stated further, in dicta: "A partial retrial that encompasses issues of both malice and punitive damages affords a defendant an even greater assurance of fairness than was found sufficient in *Torres.* In a retrial restricted to punitive damages, as in *Torres,* a new jury would receive an instruction that, in a prior proceeding, defendant's conduct was determined to be malicious. However, although the new jury will hear evidence concerning the defendant's conduct, it may not be apprised of the specific act or acts upon which the previous jury's finding of malice was based. In the *Torres*-type situation, there is a risk that the new jury could award punitive damages based on conduct the previous jury did not find malicious. Here, any such risk would be eliminated by the scope of the partial retrial. The new jury would determine whether [defendant] acted with malice and, if so, whether an award of punitive damages is warranted. Any award of punitive damages, therefore, would be made in light of specific conduct which the new jury found to be malicious." (*Barmas, supra,* at pp. 376–377, fn. omitted.)

*Sharp v. Automobile Club of So. Cal., supra,* 225 Cal.App.2d 648, in contrast, held that the order granting a new trial based on excessive punitive damages in that case must be limited to the amount of punitive damages, and reversed the order to the extent it granted a new trial on other issues. (*Id.* at p. 654.) *Sharp* rejected the defendants' argument that for a jury in the new trial "to try the issue of amount of punitive damages separate and apart from the facts which are claimed to justify it" would deny the defendants a fair trial. (*Id.* at pp. 653–654.) *Sharp* stated that the jury had properly decided that punitive damages were warranted, that the issue need not be decided again in a new trial, and that, "nothing said in this decision is intended in any way to restrict the exercise of the discretion of the trial court as to the scope of the evidence that may be introduced as to the proper amount of punitive damages notwithstanding that neither the issues of the fraud itself nor that plaintiff is entitled to such damages are to be relitigated." (*Id.* at p. 654.)

We conclude that the new trial here must be limited to determining the amount of punitive damages. Philip Morris's liability, the amount of compensatory damages, and oppression, fraud, or malice were determined in the first trial without prejudicial error. Although it is likely that much of the same

evidence presented in the first trial will be presented again in the new trial, we believe that this limitation on the issues in dispute will result in some time savings. Moreover, neither party is entitled to an opportunity to seek to either reduce or increase the amount of compensatory damages established in the first trial, and the findings of liability and oppression, fraud, or malice should not be disturbed.

In our view, the requirement that the jury must consider the degree of reprehensibility of Philip Morris's conduct that harmed Bullock provides sufficient assurance that the award of punitive damages will be based on the same course of conduct on which the first jury based its finding of oppression, fraud, or malice. The trial court in the new trial, in the exercise of its discretion, should admit evidence relevant to determining the amount of punitive damages in the same manner that a trial court in a new trial limited to the amount of compensatory damages should admit evidence relevant to determining that amount. We are aware of no requirement that the jury in the new trial must be informed of which particular acts the first jury determined to be oppressive, fraudulent, or malicious where the jury made no finding specifically identifying those acts. If the amount awarded by the jury in the new trial is excessive, an adequate remedy is available by way of a new trial motion and an appeal in which the appellate court must consider de novo the constitutional guideposts. (*Simon, supra*, 35 Cal.4th at p. 1172 & fn. 2; see *Torres, supra*, 15 Cal.4th at p. 781.) Accordingly, we conclude that a new trial limited to determining the amount of punitive damages will not prejudice Philip Morris.[22]

In light of our reversal of the judgment as to the amount of the punitive damages award, the remaining contentions by Philip Morris and Bullock concerning the amount of punitive damages are moot.

### 9. *The Award of Attorney Fees as a Sanction Was Error*

The court awarded Philip Morris $45,809.48 in attorney fees against Piuze as a sanction under Code of Civil Procedure, section 128.6. Philip Morris concedes that section 128.6 was not effective at the time of the order awarding fees and never became effective, that the court had no authority to award fees, and that the order awarding fees should be reversed.[23] We agree and reverse the order.

---

[22] We decline to follow *Medo, supra*, 205 Cal.App.3d 64, and *Barmas, supra*, 92 Cal.App.4th 372, to the extent the views expressed in those opinions may be inconsistent with our views expressed in this opinion.

[23] A court has no inherent authority to award attorney fees as a sanction. (*Bauguess v. Paine* (1978) 22 Cal.3d 626, 638–639 [150 Cal.Rptr. 461, 586 P.2d 942].)

## *DISPOSITION*

The judgment is reversed as to the amount of punitive damages and affirmed in all other respects, with directions to the superior court to conduct a new trial limited to determining the amount of punitive damages in a manner consistent with the views expressed in this opinion. The order awarding a monetary sanction against Piuze is reversed. Philip Morris and Bullock are to bear their own costs on appeal. Piuze is entitled to recover his costs on appeal.

Klein, P. J., and Kitching, J., concurred.

The petitions of appellant Jodie Bullock and appellant Philip Morris USA, Inc., for review by the Supreme Court were denied April 30, 2008, S161632. Kennard, J., was of the opinion that the petition of appellant Philip Morris USA, Inc., should be granted.