Filed 4/19/16  Frawley v. Los Angeles County MTA CA 2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| DANIEL FRAWLEY, | B254562 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC488591) |
| v. | |
| LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY, | |
| Defendant and Appellant. | |

 

APPEAL from a judgment and orders of the Superior Court of Los Angeles County, Victor E. Chavez, Judge.  Affirmed.

Ballard Rosenberg Golper & Savitt, Linda B. Hurevitz, Philip Reznik and Christine T. Hoeffner for Defendant and Appellant.

JML Law, David F. Tibor, Joseph M. Lovretovich; Benedon & Serlin, Douglas G. Benedon and Gerald M. Serlin for Plaintiff and Respondent.

_____

## INTRODUCTION

Defendant Los Angeles County Metropolitan Transportation Authority (MTA) appeals from a judgment entered in favor of plaintiff Daniel Frawley after a jury trial. It also appeals from an order denying its motion for judgment notwithstanding the verdict or a new trial, and an order granting Frawley statutory attorney's fees.

Frawley brought this action for wrongful termination in violation of the Fair Employment and Housing Act (FEHA; Gov. Code § 12940 et seq.), claiming he was terminated in retaliation for his opposition to race discrimination. On appeal, MTA claims there is no substantial evidence of the required elements of his cause of action (i.e., protected activity, causation, and pretext). MTA also challenges the sufficiency of the evidence to support the damages award and claims instructional and evidentiary error. Finally, MTA asserts the award of attorney's fees must be reversed because the judgment must be reversed. We affirm.

## STATEMENT OF FACTS[1]

### A.      FRAWLEY'S CAREER WITH MTA

Frawley began his 37-year career with MTA in 1974 as a bus operator. He was promoted several times over the years and obtained the position of transportation operations manager, as an at-will employee, in 1999. In that position, Frawley oversaw approximately 400 bus operators, plus supervisors and other staff. He was responsible for, among other things, the discipline of employees under his supervision.

In 2011, MTA reorganized its business operations. As part of the reorganization, MTA operations managers had to reapply for their jobs. Frawley, who was close to 62

---

[1]      In its statement of facts, MTA has presented the evidence in the light most favorable to itself. In justifying its self-serving presentation, MTA cites *Bowman v. Wyatt* (2010) 186 Cal.App.4th 286, 304, which held that a reviewing court applies this standard of review when considering prejudice caused by instructional error. But this standard presupposes instructional error (which we generally do not find here) and ignores MTA's challenge to the sufficiency of the evidence (which requires us to review the evidence most favorably to Frawley). We describe the facts below consistent with the substantial evidence standard of review.

years old, chose to reapply rather than accept a severance package, as he intended to work until he was 66 years old. John Roberts, MTA's Deputy Executive Officer of Operations, selected Frawley from a long list of applicants for the position of transportation operations manager. Roberts had known Frawley for about 20 years, had worked with him on several occasions, and thought highly of his knowledge and managerial ability, including his judgment, attitude, and people skills. Roberts also considered Frawley's consistently positive performance evaluations. James Woodson, an MTA superintendant who was to be Frawley's direct supervisor, agreed with Roberts' selection of Frawley.

## B. FRAWLEY'S DISCIPLINE OF TWO BUS OPERATORS IN MAY 2011

On March 2, 2011, one month after resuming the role of transportation operations manager, Frawley learned of an altercation between two of his bus operators who, for privacy reasons, were identified by their initials at trial—M, a Caucasian woman, and P, an African-American woman. Frawley interviewed the two women and had each of them prepare a written report. He then ordered two videos of the incident. One was taken by a two-way Smartdrive camera mounted on the front windshield of the bus in which the altercation took place. The camera was motion-activated, but also could be activated manually and recorded 15 seconds before and 15 seconds after activation. The other video was taken by an outside camera prior to the altercation. Frawley watched the videos with his staff, transit operations supervisors, and assistant managers to determine what had occurred.

Frawley determined that M had arrived at a layover zone, got off her bus, and boarded a bus operated by P. P was not on the bus at the time, and M entered the bus to determine the name of the operator. When P returned, she asked M why she was on the bus. M explained that she wanted to get P's identification to lodge a complaint against P. M then left P's bus, and P followed M onto her bus. P felt that M was blocking her and pushed into her. P told M, "Don't push me, bitch," several times. P then pushed M with both hands, knocking M off her feet and onto a seat six to eight feet away. M got up and walked to the front of the bus, where she manually activated the Smartdrive camera to

3

record the incident on video. As far as Frawley was aware, the video showed all the physical touching between the two women. M did not physically defend herself or retaliate against P. She did acknowledge in her subsequent statement, however, that prior to the physical altercation she called P "fat."

After completing the investigation, Frawley drafted hearing notices for the two bus operators charging each with gross misconduct, proposing a 15-day suspension for M for a verbal altercation and a 30-day suspension for P for verbal and physical altercation. Pursuant to MTA procedure, Frawley sent the draft hearing notices to Myrtle Shott, a labor relations department representative, for review. Shott responded by email, stating: "All employees involved in fights need to be terminated, no exceptions." Frawley asked if she had viewed the video of the incident, and she said, "No." Frawley was surprised by this response because Shott was telling him to terminate both women without viewing the evidence, and because the ultimate decision belonged to him after considering labor relations' recommendation.[2] He sent Shott an email asking: "How can you tell me to terminate people and you haven't even looked at the video?"

Frawley conducted formal disciplinary proceedings. After hearing from M and P, Frawley met with Roberts and told him of his proposed 15-day suspension for M and 30-day suspension for P. Roberts told Frawley that he had to terminate both employees "to be consistent," and that if Frawley did not terminate M, P would sue MTA for race discrimination. Frawley responded that it would be improper to terminate M because of her race rather than her conduct. He not only refused to do so, he told Roberts that if she were terminated, he would not testify for MTA in any arbitration over her termination. Roberts got angry and ended the conversation.

---

[2]  In early 2011, Richard Hunt, the general manager of labor-employee relations, had formulated an unwritten policy that employees involved in physical altercations would be terminated absent "rare exceptions." Previously, such employees were not necessarily terminated or even disciplined. Frawley did not learn of this new policy until he attended a training seminar that Hunt had given in June 2011. Even after implementation of the new policy, the manager made the decision about the appropriate discipline to impose.

4

A few days later, Woodson summoned Frawley to his office and handed him a letter, dated May 5, 2011, which stated that it would be "problematic to both cases to administer anything less than termination for either of these operators." Woodson would not explain what was meant by "problematic." Frawley explained that the conduct of the two bus operators differed and a distinction needed to be made between a verbal and a physical altercation. He informed Woodson that Roberts had told him to terminate both operators to prevent P from suing for race discrimination; and he reiterated that it would be illegal to terminate M because of her race, and that he would not do it. Woodson did not respond.

Frawley declined to follow the direction he had been given on discipline. He did not terminate either woman and instead imposed disparate punishment to address disparate behavior. In May 2011, Frawley suspended M for 15 days for engaging in a verbal altercation; and he suspended P for 30 days for engaging in a verbal and physical altercation. That same month, Roberts and Woodson decided to terminate Frawley. To that end, Roberts directed Woodson to begin documenting Frawley's actions.

## C.     FRAWLEY'S SUBSEQUENT ENCOUNTERS WITH ANOTHER BUS OPERATOR

In July and August of 2011, Frawley had two difficult encounters with a bus operator he supervised, Dion Dillard.

### 1.     *The July 2011 Disciplinary Hearing*

In July 2011, Frawley presided over a formal disciplinary hearing for Dion Dillard, a bus operator charged with using his cell phone while operating a bus. Dillard was represented at the hearing by his union representative, Lisa Arredondo. During the hearing, a supervisor entered and advised that Dillard had to report for his assignment to avoid delay in bus service. Believing that all relevant issues had been addressed at the hearing, Frawley attempted to conclude the proceedings. Arredondo disagreed that the hearing had concluded and told Dillard to stay. In response, Frawley gave Dillard a

direct order to report for work, reading from his "direct order card."[3] Arredondo then told Dillard to go to work, but Dillard claimed that he was too upset to work and reported that he was sick.

Later that day, Dillard discussed what had happened at his hearing with Woodson, who advised Dillard to place his complaint about Frawley in writing. Although Dillard did not want to lodge a complaint, he did so because of pressure from Woodson. When Dillard later asked about the status of his complaint against Frawley, Woodson told him: "Don't worry, I'll take care of it. He won't be here much longer." Woodson made a similar statement about Frawley's departure to an assistant transit operations manager in Frawley's division, Alicia Walker, telling her that Frawley was "on his way out."

2. *The August 2011 Confrontation*

On August 2, 2011, Dillard went to speak to Frawley about a recent incident involving his girlfriend, an MTA employee, and about his formal complaint against Frawley. Dillard said that Frawley had been disrespectful to his girlfriend when he counseled her about a driving incident involving an intoxicated passenger. Frawley informed Dillard that he was not at liberty to talk about another employee. Dillard then turned to the complaint he had filed against Frawley and asked why he had not yet received a response. Frawley explained that he had submitted a written response, and that Dillard would have to speak to Woodson at this point.

Dillard then confronted Frawley in a threatening manner. He said he wanted to talk to Frawley "man to man" about how Frawley had disrespected him at his July 2011 disciplinary hearing and stated: "We could have done this differently. Where I come from, they settle things on the streets." Dillard mentioned he had two brothers in prison, including one in Folsom for murder—which Frawley perceived to be a threat on his life. Dillard then approached Frawley, pointing his finger at him and screaming that Frawley

---

[3]    MTA's labor department provides managers with a "direct order card" to be read to employees who refuse to follow the managers' instructions, which explains the disciplinary consequences of insubordination.

needed to respect him and his girlfriend. Frawley tried to end the conversation and leave the room, but Dillard stepped in front of him and prevented him from leaving. Frawley asked Dillard to "[p]lease step away from the door" and then yelled for Walker, who was nearby, to call the police. Dillard did not step away, and Walker did not call the police.

At this point, the incident became violent. As Frawley reached into his back pocket to get a direct order card out of his wallet, Dillard—who was 30 years younger than Frawley—punched Frawley in the face and began assaulting him.[4] Dillard continued to hit Frawley, as the two wrestled on the floor. Frawley managed to hit Dillard once, but Dillard kept hitting Frawley until two men arrived to pull Dillard off of Frawley.

Frawley was covered in blood and yelled for an ambulance. He was taken to the hospital and treated. Dillard was arrested for assault and battery, and he ultimately was convicted of a misdemeanor after pleading "no contest."

## D.    MTA FIRES FRAWLEY

Roberts and Woodson visited Frawley at the hospital. Frawley explained what had happened during the altercation and told them that he wanted to return to work so as not to lose pay. Woodson told him not to return to work until the following Monday, August 8, and he would be compensated for his time off.

On August 7, Woodson advised Frawley he was being placed on administrative leave pending the outcome of the investigation into the incident with Dillard. Woodson directed Frawley to provide a written report of the incident. Frawley submitted his report on August 11 and heard nothing from Woodson or Roberts for a week.

---

[4]    Dillard's account was somewhat different. He claimed that Frawley pointed his finger in his face and told him to get out of the way so he could open the door. Dillard demanded that Frawley put his finger down; Frawley complied, but then raised his finger again. As Frawley was reaching for his wallet, he poked Dillard with his finger. Dillard did not know if Frawley had done so intentionally or accidentally. At that point, Dillard punched Frawley in the face, and a physical altercation ensued.

On August 18, Frawley found a termination letter from Woodson on his front door. The letter stated: "You are currently employed by MTA . . . as a Transportation Operations Manager, which is an At-will position. I regret to inform you that your employment is terminated effective close of business August 19th. [¶] Please call me . . . to arrange to pick up your personal items and to deliver Metro property in your possession." Neither Woodson nor Roberts spoke to Frawley about the reason for his termination.

Woodson also terminated Dillard, telling him that he did not want to do it but that he had no choice. Woodson encouraged Dillard to "go after" Frawley and gave him documents with Frawley's personal information, including his home address, social security number, and rate of pay. Woodson told Dillard to keep the matter between themselves. He later asked Dillard to return the confidential documents so he could shred them, but Dillard never did so.

## E.    THE REASONS FOR FRAWLEY'S TERMINATION

Roberts made the decision to terminate Frawley with Woodson's input. Roberts submitted his request to terminate Frawley to the human resources department, which was then reviewed by a group of county representatives. The stated reason for the termination request, and the one discussed by the group, was the physical altercation between Dillard and Frawley.

According to Frawley, the physical altercation with Dillard was not the real reason he was terminated. Months before, in May 2011, Roberts and Woodson had decided to fire him for his refusal to terminate M to avoid a racial discrimination claim. At that time, Roberts directed Woodson to start documenting Frawley's behavior to support the anticipated termination. To that end, Woodson completed a "Summary of Some Behavior and Actions by Dan Frawley" in August 2011 after Frawley's termination. The first incident in the summary was Frawley's refusal to terminate M and P, as recommended.

The summary alleged four additional incidents in 2011. In April, Frawley, against Woodson's advice, distributed conflicting policy memoranda about talking or texting on

8

cell phones while operating a bus. Woodson did not counsel Frawley about his decision. In June, Frawley charged a bus operator who had gotten into an accident while talking on the bus's hand-held radio with gross negligence rather than gross misconduct, as Woodson had recommended. Woodson did not counsel Frawley on the disagreement about the appropriate level of discipline. In July, Shott told Woodson that Frawley had threatened to sue her for copying her boss on Frawley's correspondence and disparaged her in front of her peers. Woodson had no corroboration of, and never spoke to Frawley about, Shott's allegations. In August, Frawley failed to timely provide a written report of the incident with Dillard. Woodson admitted, however, that Frawley's four-day response time was reasonable.

Roberts claimed he did not discuss the incidents with Frawley because he was an at-will employee. Roberts would only have raised them as part of Frawley's year-end evaluation, though Frawley had not been given such an evaluation for the past three years. Roberts nonetheless expected Frawley to have "an awareness of our displeasure."

## F.    FRAWLEY'S DAMAGES

Frawley was devastated by his termination from the job he had loved for 37 years. Aside from the emotional distress, he suffered physical effects, including headaches, heart palpitations, and nightmares. The traumatic effects were so great that Frawley was unable to return to work. Economist Marianne Inouye calculated Frawley's economic losses. Assuming his losses started on September 2, 2011 and he would have retired at age 66, she calculated his past and future losses to total $504,092.

**PROCEDURAL BACKGROUND**

In 2012, Frawley filed this lawsuit, alleging causes of action for retaliation, discrimination, and failure to prevent discrimination and harassment under FEHA. He dismissed the latter two causes of action prior to trial and proceeded solely on his retaliation claim.

In 2013, the case went to trial. The jury returned a special verdict in favor of Frawley, finding that: (1) Frawley opposed race discrimination (11-1); (2) his opposition was "a substantially motivating reason for [MTA's] decision to discharge" him (10-2);

9

(3) MTA had other legitimate, nondiscriminatory reasons for discharging him (12-0);[5] and (4) MTA would not "have discharged Frawley anyway based solely on its legitimate non-discriminatory reasons had MTA not taken his opposing race discrimination into account" (12-0).

The jury found MTA's conduct harmed Frawley and awarded him $504,000 in economic damages and $100,000 in noneconomic damages. The award was reduced by $51,324, an offset for state disability payments he received for lost earnings, leaving a total judgment of $552,676. The trial court also granted him $24,818.42 in costs and $300,000 in statutory attorney's fees.

## DISCUSSION

### A.    THE CHALLENGE TO THE SUFFICIENCY OF THE EVIDENCE

MTA contends that the evidence at trial was insufficient to support the jury's finding of retaliation and its award of damages. When a party challenges the sufficiency of the evidence to support a jury verdict, the review on appeal is for substantial evidence. (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1096.) In reviewing for substantial evidence, we view the record in the light most favorable to the prevailing party, which requires us to resolve all conflicting testimony and draw all reasonable inferences in favor of the judgment. (*Ibid*.) In discharging our responsibilities, we are also mindful that a retaliation claim primarily focuses on the question of motivation, which requires an evaluation of witness credibility—a task that belongs to the jury. While this does not leave us without a role, ours is a limited one. We consider the weight and character of the evidence rather than its persuasiveness. (*Joaquin v. City of Los Angeles* (2012) 202 Cal.App.4th 1207, 1218-1219.)

#### 1.    *The Retaliation Evidence*

Under FEHA, an employer generally may not discriminate against an employee or prospective employee on the basis of, among other things, race. (Gov. Code, § 12940,

---

[5]    Frawley all but conceded this issue in closing argument.

10

subd. (a).) An employer also may not retaliate against an employee for engaging in activity protected under this law. (*Id.*, § 12940, subd. (h).) To establish a prima facie case of unlawful retaliation, a plaintiff must demonstrate that he or she was subjected to an adverse employment action for engaging in protected activity. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.) If the employee states a prima facie case, the burden of production shifts to the employer to show that it took action for a reason other than retaliation. (*Ibid.*) If the employer is able to do so, the burden shifts back to the plaintiff to produce evidence that the employer's articulated reason was pretextual, masking the real, retaliatory motive. (*Ibid.*; accord, *McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 298.) MTA claims that the evidence was insufficient to support a finding of liability for two reasons.

First, MTA argues that the jury reasonably could not have found that Frawley was discharged for having engaged in protected activity (i.e., opposing racial discrimination) because the evidence established that MTA was attempting to enforce the law rather than to discriminate. MTA asserts: "Roberts was properly concerned and communicated to Frawley that imposing more discipline on a [B]lack employee than a [W]hite employee who violated the same policy could be viewed as discrimination and result in a FEHA claim. Frawley admitted Roberts said 'we need to be consistent' in imposing discipline on the two operators and that failing to do so would result in a discrimination claim. This is what Frawley opposed. Opposing MTA's efforts to prevent discrimination is ***not*** protected activity."

This is one interpretation of the evidence. But it is not the only one, as the jury concluded. The evidence, viewed in the light most favorable to the judgment, showed that Frawley wanted to impose different discipline on the two bus operators based on different levels of misconduct. Roberts told Frawley to terminate both employees "to be consistent," because if Frawley did not terminate M, P would sue MTA for race discrimination. Frawley took the position that terminating the Caucasian employee solely to prevent the African-American employee from suing for race discrimination—despite

11

the disparity in conduct of the two employees—would amount to terminating M because of her race in violation of the law.

The jury in this case thus faced conflicting evidence about the communication between Roberts and Frawley. According to Roberts, he merely communicated his concern about engaging in discrimination by treating two *similarly* situated employees differently. According to Frawley, however, Roberts directed him to treat two *dissimilarly* situated employees the same to avoid a (meritless) racial discrimination lawsuit. It was the province of the jury to decide which version of the facts to believe.[6] The evidence therefore is sufficient to establish that Frawley engaged in protected activity. (*McCoy v. Pacific Maritime Assn.*, *supra*, 216 Cal.App.4th at pp. 300-301.)[7]

Second, MTA argues that the evidence was insufficient to support the jury's finding of pretext. The jury unanimously found that while MTA had legitimate, nondiscriminatory reasons for discharging Frawley, it would not "have discharged Frawley anyway based solely on its legitimate non-discriminatory reasons had MTA not taken his opposing race discrimination into account." In other words, the jury concluded that the reasons given for the discharge were pretextual. Substantial evidence supports that conclusion.

Frawley adduced evidence that Roberts and Woodson agreed to rehire Frawley as a manager based on his numerous years of good performance, and that they embarked

---

[6] To overturn the jury's evaluation of credibility, it is not enough for MTA to identify contradictions in Frawley's testimony. (See *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631 [if any "'substantial' evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld"].) Nor is it enough to show that MTA had a policy of terminating all employees involved in a fight, as the jury could have concluded that Frawley reasonably believed that this was a one-sided fight (i.e., only P used physical violence).

[7] MTA also argues that the evidence is insufficient to show causation: "Having failed to establish a protected activity, Frawley could not show any causal connection between a nonexistent protected activity and his discharge." Because Frawley did establish a protected activity, this argument likewise fails.

12

upon a course to fire him almost immediately after he engaged in the protected activity. Roberts directed Woodson to begin documenting Frawley's actions, resulting in almost monthly reports of purported misconduct that was not shared with Frawley before terminating him. In addition, Woodson told Walker that "[Frawley was] on his way out" and informed Dillard that "[Frawley] won't be here much longer." A reasonable jury could have concluded from this evidence that Roberts and Woodson decided to terminate Frawley because he refused to engage in discrimination, that they went looking for reasons to terminate him, and that they used the fight with Dillard as the basis for doing so. The evidence thus supports a finding that MTA's motive in terminating Frawley was retaliatory and pretextual. (*Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th at p. 1062 [material change in performance evaluations after engaging in protected activity is circumstantial evidence of pretext]; accord, *Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, 141 ["A jury could reasonably infer from the [defendant's] sudden change of position [about the plaintiff's job performance] that the [defendant's] professed reasons for termination were pretextual"].)

MTA ignores this evidence and focuses instead on facts supporting its termination decision. The supporting facts, even if accepted, prove only that MTA had a legitimate reason for terminating Frawley (as the jury ultimately found without serious opposition). They do not disprove the jury's conclusion, based on other facts, that the real motive for discharging Frawley was to retaliate against him for engaging in protected activity. For similar reasons, MTA has not shown that the jury could only have based its decision on impermissible facts and conclusions—i.e., by second-guessing its violence prevention policy, by misinterpreting the Smartdrive video of the incident between M and P, by questioning MTA's investigation into the fighting incident with Dillard, and by criticizing its decision not to counsel an at-will employee before discharging him.

2. *The Damages Evidence*

MTA next asserts that there is no substantial evidence of either the fact of damages or the amount of damages awarded by the jury. (See *Asahi Kasei Pharma Corp. v. Actelion Ltd.* (2013) 222 Cal.App.4th 945, 972-973 [plaintiff must show fact of and

13

amount of damages in the trial court]; *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1208 [appellate review is for substantial evidence].)

In arguing that Frawley did not prove he was even damaged by being discharged, MTA claims that he was "an at-will employee" who engaged in misconduct and did not mitigate damages. But the jury concluded that MTA discharged Frawley unlawfully in retaliation and otherwise would not have terminated his employment. From this conclusion the fact of damages (i.e., lost wages) readily follows. The alleged failure to mitigate damages goes to the question of the amount—not the fact—of damages. (See *Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 871 ["'general rule is that the measure of recovery by a wrongfully discharged employee is the amount of salary agreed upon for the period of service, less the amount which the employer affirmatively proves the employee has earned or with reasonable effort might have earned from other employment'"].) MTA bore the burden of showing that Frawley failed to mitigate damages. (*Candari v. Los Angeles Unified School Dist.* (2011) 193 Cal.App.4th 402, 409.) The jury reasonably found that MTA failed to satisfy its burden by failing to show how much Frawley could have earned from comparable employment that was available to him. (See *ibid.*)

MTA's challenge to the amount of damages awarded fares no better. "Where the *fact* of damages is certain, as here, the *amount* of damages need not be calculated with absolute certainty. The law requires only that some reasonable basis of computation be used, and the result reached can be a reasonable approximation." (*Acree v. General Motors Acceptance Corp.* (2001) 92 Cal.App.4th 385, 398, fns. omitted.) Frawley satisfied this standard through his own testimony and that of his expert, an economist, who calculated past and future lost earnings. The expert's opinion was largely unchallenged. For whatever reason, MTA elected not to proffer its own expert. As the jury's award was reasonably grounded in the testimony of Frawley and his economist, the evidence was sufficient to support it.

14

## B. CLAIMS OF INSTRUCTIONAL ERROR

A trial court has a duty to instruct the jury on "'all points of law necessary to a decision.' [Citation.]" (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82.) "A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence. The trial court . . . must instruct in specific terms that relate the party's theory to the particular case. [Citations.]" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) However, "[a] court may refuse a proposed instruction that incorrectly states the law or is argumentative, misleading, or incomprehensible to the average juror, and ordinarily has no duty to modify a proposed instruction. [Citations.] A court may refuse a proposed instruction if other instructions given adequately cover the legal point. [Citation.]" (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 684-685.)

On appeal, we review the propriety of the jury instructions de novo. (*Cristler v. Express Messenger Systems, Inc.*, *supra*, 171 Cal.App.4th at p. 82.) In considering the accuracy or completeness of an instruction given, we evaluate it in the context of the overall jury charge. (*Ibid*.) For challenges to the failure to instruct on a point of law, we examine the record for substantial evidence to support the request, viewing the evidence in the light most favorable to the appellant. (*Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 475.) We will not reverse the judgment for instructional error unless the error results in a miscarriage of justice, i.e., "'where it seems probable' that the error 'prejudicially affected the verdict.'" (*Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at p. 580.)

### 1. *Business Judgment*

At both parties' request, the trial court instructed the jury on the business judgment rule pursuant to CACI No. 2513. The instruction closely tracked the language in CACI No. 2513, stating: "Frawley must prove each of the elements of his claim for retaliation. In California, employment is presumed to be 'at will.' That means that an employer may fire an employee for no reason, or for a good, bad, mistaken, unwise, or even unfair

reason, as long as its action is not for an unlawful reason."[8]  The official directions for use of this instruction provide:  "Give this instruction to advise the jury that the employer's adverse action is not illegal just because it is ill-advised.  It has been held to be error not to give this instruction.  (See *Veronese v. Lucasfilm Ltd*. (2012) 212 Cal.App.4th 1, 20-24 . . . .)"

Despite the trial court's use of this instruction as directed, MTA claims that the court violated the holding in *Veronese* by neglecting to properly instruct the jury on the business judgment rule.  In that case, the court held that the trial court erred in refusing to give a special instruction that read:  "'You may not find that Lucasfilm discriminated or retaliated against Julie Gilman Veronese based upon a belief that Lucasfilm made a wrong or unfair decision.  Likewise, you cannot find liability for discrimination or retaliation if you find that Lucasfilm made an error in business judgment.  Instead, Lucasfilm can only be liable to Julie Gilman Veronese if the decisions made were motivated by discrimination or retaliation related to her being pregnant.'" (*Veronese v. Lucasfilm Ltd.*, *supra*, 212 Cal.App.4th at p. 20, fn. omitted.)  In discussing the error, the court did not suggest that the specific language in the instruction was required.  Rather, an instruction on the business judgment rule must convey to the jury that "a plaintiff in a discrimination case must show discrimination, not just that the employer's decision was wrong, mistaken, or unwise." (*Id*. at p. 21.)[9]

---

[8]  The trial court also instructed the jury on the elements of a claim for retaliation, including requiring Frawley to prove "[t]hat Frawley's opposing race discrimination was a substantial motivating reason for MTA's decision to discharge Frawley."  (CACI No. 2505.)

[9]  The court noted that the following at-will instruction given by the trial court did not include this concept:  "'All employment in California is what is called "at will," unless there is a written contract providing that the employee can only be terminated for "good cause."  At will employment means that either the employee or the employer may end the employment relationship at any time, for any reason, or for no reason, except that the employer may not end the employment relationship if motivated to do so by discrimination or retaliation.'" (*Veronese v. Lucasfilm Ltd.*, *supra*, 212 Cal.App.4th at p. 23, fn. 11.)

Here, MTA proposed a special instruction that was modeled directly after the one refused in *Veronese* (quoted above).[10] But the CACI instruction given in this case specifically responded to the shortcoming noted in *Veronese* by including the language omitted there. The trial court instructed the jury that "an employer may fire an employee for no reason, or for a good, bad, mistaken, unwise, or even unfair reason, as long as its action is not for an unlawful reason." Because the essence of the business judgment rule was adequately covered in CACI No. 2513, the trial court did not err in refusing to give MTA's proposed Special Instruction No. 10. (*Bullock v. Philip Morris USA, Inc.*, *supra*, 159 Cal.App.4th at p. 685.)

2. *Reasonable Belief*

At the request of both parties, the trial court instructed the jury on the elements of a retaliation claim pursuant to CACI No. 2505.[11] The first element required the jury to find that "Frawley engaged in a legally protected activity, namely he opposed race discrimination." On appeal, MTA claims that the jury instead should have been instructed that Frawley had to prove that "he held a ***reasonable*** belief that he was opposing discrimination."

---

[10]    Special Instruction No. 10 read: "You may not find that MTA discriminated or retaliated against Plaintiff based upon a belief that Defendant made a wrong or unfair decision. Likewise, you cannot find liability for discrimination or retaliation if you find that MTA made an error in business judgment. Instead, MTA can only be liable to Plaintiff if the decisions made were motivated by discrimination or retaliation related to Plaintiff's opposing race discrimination."

[11]    The complete instruction given stated: "Daniel Frawley claims that MTA retaliated against him for opposing race discrimination. To establish this claim, Daniel Frawley must prove all of the following: [¶] 1. That Frawley engaged in a legally protected activity, namely he opposed race discrimination; [¶] 2. That MTA intended to retaliate against Frawley for opposing race discrimination; [¶] 3. That MTA terminated Frawley; [¶] 4. That Frawley's opposing race discrimination was a substantial motivating reason for MTA's decision to discharge Frawley; [¶] 5. That Frawley was harmed; and [¶] 6. That MTA's conduct was a substantial factor in causing Frawley's harm."

17

In advancing this claim, MTA relies on a legal principle applicable in some but not all retaliation cases. In some cases, a plaintiff suffers an adverse employment action for opposing what he or she mistakenly believes is discriminatory activity. An erroneous but reasonable belief is not a bar to recovery. "It is well established that a retaliation claim may be brought by an employee who has complained of or opposed conduct that the employee reasonably believes to be discriminatory, even when a court later determines the conduct was not actually prohibited by the FEHA." (*Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th at p. 1043.)

MTA does not contend that it was entitled to an instruction about "reasonable belief" because it was lawful for Roberts to direct Frawley to punish M exactly the same as P for different behavior to avoid a race discrimination lawsuit. Instead, MTA disputes that Frawley was directed to terminate M for that reason. In these circumstances, the reasonableness of Frawley's beliefs is not at issue. That is, if MTA terminated Frawley because he engaged in undisputedly protected activity, then it violated FEHA irrespective of Frawley's understanding of the law. Thus, the instruction given appears to have addressed the legal principles raised by the facts in the case.

But even if it did not, MTA was obligated to request an appropriate instruction in the trial court. It is well settled that "a party challenging an instruction on the grounds that the instruction, although legally correct, is too general, lacks clarity or is incomplete must request the additional or qualifying instruction in order to preserve those grounds for appeal." (*Bell v. H.F. Cox, Inc.* (2012) 209 Cal.App.4th 62, 81; accord, *Holguin v. Dish Network LLC* (2014) 229 Cal.App.4th 1310, 1319.) This required MTA to propose an instruction that correctly stated the law on the issue raised on appeal. Because MTA failed to request any such instruction, it cannot now be heard to complain.

3.    *Pretext*

MTA next claims that the instruction on the elements of the retaliation claim was erroneous because it failed to instruct the jury that Frawley had the burden of proving that the legitimate reasons for his termination were pretextual. Specifically, MTA complains that the modified version of CACI No. 2505 "did not tell the jury that MTA [may have]

18

had legitimate reasons for the discharge and that ***Frawley*** retained the burden of proving the reasons were a pretext and the real reason was retaliation for opposing race discrimination." In support, MTA cites *Joaquin v. City of Los Angeles*, *supra*, 202 Cal.App.4th 1207, noting that case's criticism of the model instruction "because it contains no element requiring that ***plaintiff*** prove retaliatory intent."

However, the modified instructions in this case addressed the perceived deficiency noted in *Joaquin*. Unlike in that case, the trial court here instructed the jury on the element of retaliatory intent, requiring Frawley to prove "[t]hat MTA intended to retaliate against Frawley for opposing race discrimination." The jury was further instructed that Frawley had to prove "[t]hat Frawley's opposing race discrimination was a substantial motivating reason for MTA's decision to discharge Frawley." Although the instruction did not use the exact words that MTA now demands, it adequately conveyed the elements of a retaliation claim and imposed the burden of proof on Frawley alone. Moreover, to the extent MTA believed that the instruction should have been modified further, the time to propose modifications was during trial. (*Holguin v. Dish Network LLC*, *supra*, 229 Cal.App.4th at p. 1319.)[12]

4.    *Mixed Motive*

The trial court instructed the jury on the mixed motive defense pursuant to CACI No. 2512. MTA argues that the instruction was erroneous because (1) MTA did not present a mixed motive defense at trial, and (2) the instruction directed the jury to accept as true that MTA took into account Frawley's opposition to discrimination in deciding to discharge him. Neither argument has merit.

First, the record indicates that MTA did indeed request instruction on a mixed motive defense. According to this defense, "[w]hen a plaintiff has shown by a preponderance of the evidence that discrimination was a substantial factor motivating his or her termination, the employer is entitled to demonstrate that legitimate,

---

[12]    In addition, CACI No. 2512 on Limitation on Damages—Same Decision, which we discuss *post*, covers the concept of pretext.

nondiscriminatory reasons would have led it to make the same decision at the time. If the employer proves by a preponderance of the evidence that it would have made the same decision for lawful reasons, then the plaintiff cannot be awarded damages, backpay, or an order of reinstatement." (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 241.)

Before trial, MTA informed the court through the joint statement of the case that it would be presenting this defense. The court was told: "MTA contends that it had a legitimate, non-discriminatory reason for terminating [Frawley's] employment and that it would have made the same decision whether [Frawley] opposed race discrimination or not. MTA denies [Frawley's] claim for injuries and damages." Consistent with this statement, the trial court instructed the jury on the defense using an instruction requested by both parties. As modified and given to the jury, CACI No. 2512 read: "Frawley claims that he was discharged because of opposing race discrimination, which is an unlawful reason. MTA claims that Frawley was discharged for legitimate non-discriminatory reasons. [¶] If you find that legitimate non-discriminatory reasons were also a motivating reason then you must determine whether MTA has proven that it would have discharged Frawley even if it had not taken opposing race discrimination into account. [¶] In determining whether the legitimate non-discriminatory reasons were a motivating reason, determine what actually motivated MTA, not what it might have been justified in doing."

The trial court, therefore, did not err in instructing the jury on the mixed motive defense. If MTA changed its theory or believed the evidence did not support that theory, it was MTA's duty to propose proper instructions that were consistent with its defense. "'Neither a trial court nor a reviewing court in a civil action is obligated to seek out theories plaintiff might have advanced, or to articulate for him that which he has left unspoken.' [Citation.]" (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1131.) MTA cannot now challenge an instruction it requested be given. (See *ibid.* ["Plaintiff's failure to request any different instructions means he may not argue on appeal the trial court should have instructed differently"].)

20

Second, the instruction did not direct the jury to accept as true disputed facts about whether Frawley had engaged in protected activity and whether MTA had discharged him for his having done so. The first paragraph of the instruction explained the competing claims of the parties: "Frawley claims that he was discharged because of opposing race discrimination," while "MTA claims that Frawley was discharged for legitimate non-discriminatory reasons." The second paragraph introduced the mixed motive concept: "If you find that legitimate non-discriminatory reasons were also a motivating reason then you must determine whether MTA has proven that it would have discharged Frawley even if it had not taken opposing race discrimination into account." MTA is correct that the instruction omitted a sentence before the second paragraph, which should have stated: "If you find that opposing race discrimination was a substantial motivating reason for Frawley's discharge, you must then consider MTA's stated reason for the discharge."[13] However, we do not find this omission to have resulted in a miscarriage of justice warranting reversal.

"Whether a jury has been misled by an erroneous instruction or by the overall charge must be determined by an examination of all the circumstances of the case including a review of all of the evidence as well as the instructions as a whole." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 59; accord, *People v. Harrison* (2005) 35 Cal.4th 208, 252.) Here, the jury was clearly informed in CACI No. 2505 that Frawley had the burden of proving each element of his retaliation claim, including that Frawley's

---

[13]     According to CACI No. 2512, the entire instruction should have read: "Frawley claims that he was discharged because of opposing race discrimination, which is an unlawful reason. MTA claims that Frawley was discharged for legitimate non-discriminatory reasons. [If you find that opposing race discrimination was a substantial motivating reason for Frawley's discharge, you must then consider MTA's stated reason for the discharge.] If you find that legitimate non-discriminatory reasons were also a motivating reason then you must determine whether MTA has proven that it would have discharged Frawley even if it had not taken opposing race discrimination into account. In determining whether the legitimate non-discriminatory reasons were a motivating reason, determine what actually motivated MTA, not what it might have been justified in doing." The bracketed material was omitted from the instruction.

21

discharge was actually and substantially motivated by MTA's intent to retaliate against him for opposing racial discrimination. (See fn. 11, *ante*, p. 17 [complete instruction].) "If we assume, as we must, that '"the jurors [were] intelligent persons and capable of understanding *and correlating* all jury instructions . . . given . . . " [citation]' [citation]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1089), then we must conclude that they did not read the mixed motive instruction to eliminate Frawley's burden of proving his retaliation claim. Rather, a reasonably intelligent jury would have understood that they would consider any mixed motive only after finding that Frawley had satisfied his burden. Therefore, it is not reasonably probable that the jury's verdict was based on the ambiguity in CACI No. 2512.

   5.      *Speculation Prohibited*

The trial court refused MTA's Special Instruction No. 14, which read: "A party may satisfy its burden of proof only with facts and evidence, not speculation, conjecture, supposition, or unsubstantiated perceptions or suspicions of improper motives." In asserting error, MTA relies on a case affirming a grant of summary judgment because the plaintiff failed to produce substantial evidence of discriminatory motive and offered instead "rank speculation." (*McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1537.) That case, however, does not mandate a specific instruction on speculation in all FEHA trials; and MTA has not shown that the standard instructions on evidence given here were inadequate. (CACI No. 200 [explaining that a party must satisfy burden of proof "by the evidence presented in court"]; CACI No. 5002 [explaining that the jury must decide the case based only on the evidence presented at trial and further explaining what constitutes evidence]; see also CACI No. 202 [explaining direct and indirect evidence]; CACI No. 5003 [explaining witness testimony].)

Accordingly, the trial court did not err in declining to separately instruct the jury on speculation. (*Bullock v. Philip Morris USA, Inc.*, *supra*, 159 Cal.App.4th at p. 685) ["A court may refuse a proposed instruction if other instructions given adequately cover the legal point"].)

22

## C. ADMISSION OF THE SMARTDRIVE VIDEO

Prior to trial, MTA made a motion in limine to exclude the video taken by the Smartdrive camera principally on the grounds it was irrelevant and its probative value was outweighed by the risk it would confuse the jury and create undue prejudice. The trial court denied the motion, and MTA now asserts error.

"'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Such evidence is subject to exclusion, however, "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Id*., § 352.) A trial court has broad discretion in deciding whether evidence is relevant and whether to exclude it under section 352 of the Evidence Code. (*Velasquez v. Centrome, Inc.* (2015) 233 Cal.App.4th 1191, 1211.) The trial court did not abuse its discretion here.

The video was clearly relevant and highly probative. Indeed, the evidence was central to the case. Frawley claimed that he considered the video in evaluating whether M's and P's conduct was similar warranting similar punishment, and he concluded that it was not. Roberts testified that he and Frawley watched the video while discussing the appropriate discipline, and he reached a different conclusion based on his review of the video. The video was thus relevant in evaluating the credibility of these witnesses and assessing their actions and motivations.

Contrary to MTA's assertion, the trial court was not required to exclude the video because it was misleading or unduly prejudicial. The video was not misleading simply because it captured only a portion of the dispute between M and P, particularly when there was other evidence to fill in the gaps. Equally without merit is MTA's string of arguments about why the video was unduly prejudicial. We fail to see how the introduction of highly probative evidence, among other related things, "caused a side show in which Frawley misdirected the jury to ignore Frawley's burden of proof, second-

23

guess MTA's discharge policy, make its own 'investigation' without all the evidence, and assess whether discharging the operators was 'fair.'"

The trial court did not abuse its discretion in admitting the video. (*People v. Panah* (2005) 35 Cal.4th 395, 474; see *Jones v. City of Los Angeles* (1993) 20 Cal.App.4th 436, 445.)[14]

## DISPOSITION

The judgment, order awarding attorney's fees, and order denying the motion for judgment notwithstanding the verdict or a new trial are affirmed. Frawley is awarded his costs on appeal.

BLUMENFELD, J.[*]

We concur:

PERLUSS, P. J.

ZELON, J.

---

[14]　In light of our rejection of MTA's claims of error on appeal, we need not address its contention that the award of attorney's fees and costs must be reversed because the judgment must be reversed. Further, because MTA raises no claims of error with respect to the order denying its motion for judgment notwithstanding the verdict or a new trial, we deem any such claims to be forfeited. (*Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125.)

[*]　Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.